```
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------X
FRANCIS ADAMS,
```

        Plaintiff,

                  **MEMORANDUM & ORDER**

     -against-             16-CV-5352 (GRB)

```
LIBERTY MARITIME CORPORATION,
FUTURE CARE, INC. and CAPTAIN
JOHN JOSEPH MCAULIFFE,
```

        Defendants.

```
----------------------------------------------------------X
```
**GARY R. BROWN, United States Magistrate Judge:**

  Presently before the Court is defendants' motion seeking summary judgment and to preclude certain expert testimony by plaintiff's treating physicians, primarily based upon a purported failure to comply with discovery obligations. As plaintiff has waived his right to a jury trial, any claims remaining after these motions will be tried before the Court. For the reasons set forth herein, defendants' application to bar the testimony of plaintiff's treating physicians is denied, as is the portions of the summary judgment motions that rest upon such a determination. At the same time, the parties are advised that, given that this will be tried without a jury, the Court will carefully monitor the expert testimony offered to ensure that the evidence admitted comports with established requisites. Furthermore, defendants' motion for summary judgment is granted in part, in particular the application for summary judgment as to defendant Future Care, Inc.

# PROCEDURAL HISTORY

This case was commenced via the filing of a complaint on September 26, 2016. Docket Entry No. ("DE") 1. Discovery commenced following an initial conference on February 10, 2017. DE 32. On April 10, 2018, the parties agreed to the jurisdiction of the undersigned for all purposes, which agreement was "So Ordered" by the District Judge Denis R. Hurley. Order dated April 10, 2018. On June 5, 2018 an amended complaint, including a jury demand, was filed, though the jury demand was later withdrawn. DE 66. Discovery was vigorous, requiring the resolution of several disputes between the parties.

Of particular note, plaintiff attempted to secure *de bene esse* depositions[1] of his treating physicians. Because of difficulties locating one of his treating physicians, Dr. Duarte, who was based abroad, the Court permitted such deposition. Order dated June 4, 2018. At the same time, based upon defendants' opposition thereto, the Court denied the application for a *de bene esse* deposition of Dr. Chang, a treating cardiologist based in Houston. Order dated June 8, 2018. The Court further held that:

> Nothing in this Order should be read as prohibiting plaintiff from calling Dr. Chang as a witness at trial. To this end, defendants' request to limit testimony received from Dr. Chang at trial is denied as premature with leave to renew.

*Id.* The record is devoid of any indication that defendants sought to depose Dr. Chang. The instant motion followed.

---

[1] The literal translation of this phrase—roughly "of these goods" or "of well-being"—is less helpful than its connotation, to wit: provisionally or subject to ratification. A *de bene esse* deposition is taken when a witness may not be available for trial, generally construed as "in anticipation of a future need." *Manley v. AmBase Corp.*, 337 F.3d 237, 247 (2d Cir. 2003) (quoting *Black's Law Dictionary* 408 (7th ed.1999)). Nearly two hundred years ago—coincidentally in the context of a maritime dispute—the Supreme Court observed that "no such deposition can be read, unless due diligence be first used to obtain the attendance of the witness at the trial." *Patapsco Ins. Co. v. Southgate*, 30 U.S. 604, 606–07 (1831).

**LEGAL STANDARD**

The instant motion for summary judgment is decided under the oft-repeated and well understood standard for review of such matters, as discussed in *Bartels v. Inc. Vill. of Lloyd Harbor,* 97 F. Supp. 3d 198, 211 (E.D.N.Y. 2015), *aff'd sub nom. Bartels v. Schwarz*, 643 F. App'x. 54 (2d Cir. 2016), which discussion is incorporated by reference herein.

To oppose a motion for summary judgment, a party is required by the Court's Local Rules to submit a Statement of Material Facts upon which it contends there "exists a genuine issue to be tried" and "each statement controverting any statement of material fact . . . must be followed by citation to evidence which would be admissible, set forth as required by Fed. R. Civ. P. 56(c)." L. Civ. R. 56(d); *Tuccio v. FJC Sec. Servs., Inc.*, No. CV 12-5506(JFB)(GRB), 2014 WL 4438084, at *5 (E.D.N.Y. Aug. 18, 2014), *adopted by*, 2014 WL 4438469 (E.D.N.Y. Sept. 8, 2014), *appeal dismissed*, (2d Cir. Mar. 18, 2015). A party may not rest on a mere denial without citing supporting admissible evidence. "Merely denying certain statements in the moving party's statement of undisputed material facts without stating the factual basis for such denial and without disclosing where in the record is the evidence relied upon in making such denial does not constitute a 'separate, short, and concise statement of the material facts as to which it is contended that there exists a genuine issue to be tried'—as is required to controvert the moving party's statement of undisputed material facts." *Covelli v. Nat'l Fuel Gas Distrib. Corp.*, No. 99-cv-0500E(M), 2001 WL 1823584, at *1 (W.D.N.Y. Dec. 6, 2001) (citing *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 74 (2d Cir. 2001)), *aff'd, Covelli v. Nat'l Gas Distrib. Corp.*, 49 F. App'x 356 (2d Cir. 2002).

Upon the failure to properly controvert a movant's statement of material fact, such statement "will be deemed admitted for the purposes of the motion." L. Civ. R. 56.1(c); *D.N. ex rel. D.N. v. Bd. of Educ. of Ctr. Moriches Union Free Sch. Dist.*, No. CV 14-99 (GRB), 2015 WL

5822226, at *3, n.3 (E.D.N.Y. Sept. 28, 2015); *see also Edmonds v. Seavey*, No. 08 CIV. 5646 (HB), 2009 WL 2949757, at *1, n.2 (S.D.N.Y. Sept. 15, 2009), *aff'd*, 379 F. App'x 62 (2d Cir. 2010); *AFL Fresh & Frozen Fruits & Vegetables, Inc. v. De-Mar Food Servs. Inc.*, No. 06 Civ. 2142(GEL), 2007 WL 4302514, at *5 (S.D.N.Y. Dec. 7, 2007). Again, district courts have "broad discretion to determine whether to overlook a party's failure to comply with local court rules," *Holtz*, 258 F.3d at 73, and the Court may not rely solely upon the failure to controvert assertions made in a Rule 56.1 statement if those assertions are not supported in the record. *See Giannullo v. City of N.Y.*, 322 F.3d 139, 140 (2d Cir. 2003) ("[E]ven though plaintiff's Rule 56.1 counter-statement failed to specifically controvert these assertions, the unsupported assertions must nonetheless be disregarded and the record independently reviewed"); *but see Jackson v. Fed. Express*, 766 F.3d 189, 196 (2d Cir. 2014) (distinguishing *Giannullo* and upholding default where "each statement of proposed undisputed facts was supported by a citation to the record sufficient to prove each such fact").

Plaintiff's counsel has, in certain instances, opted to ignore the mandates of Rule 56.1, failing to support some of its denials with citations to record evidence. Thus, plaintiff has effectively conceded those assertions which are supported by the evidence cited. The Court has, as required, reviewed the evidence cited by parties to ensure that the assertions are, in fact, supported by evidence of record.

## FACTS

This case arises from events that occurred aboard the M/V Liberty Eagle, a merchant ship owned and operated by defendant Liberty Maritime Corporation ("Liberty"), in or around 2013. *See*, *generally* DE 66. While the filings only provide skeletal background concerning the voyage, it appears that defendant Captain John Joseph McAuliffe was in charge of the vessel, upon which

4

the plaintiff Francis Adams ("plaintiff") served as a seaman. *Id.* In the amended complaint, plaintiff is described as "a key and essential employee in the discharge of sorghum/grain at the Port of Sudan due to his knowledge regarding bucket discharge." *Id*. at ¶ 12. Factual disagreement begins in or around early October 2013, when the M/V Liberty Eagle was near the Port of Sudan, at which time plaintiff reportedly began experiencing medical symptoms, most notably "painful swollen legs from his calves all the way down to his feet." *Id.* at ¶ 9. By October 3, the amended complaint charges, and it seems undisputed, that plaintiff requested of Captain McAuliffe that he be transported for "shore side medical treatment." *Id*.

Plaintiff claims, and there is at least some support in the record, that apparently serious medical symptoms and ailments suffered by plaintiff were ignored by Captain McAuliffe, misreported to the representatives of Future Care, Inc. ("Future Care") (which was hired to provide medical consultation with physicians via electronic communications) and improperly recorded in the ship's records.

For example, it is apparently undisputed that after the Captain reported the swelling of plaintiff's legs to a physician engaged by Future Care, that physician advised that these symptoms were likely related to "venous stasis disease," and that the plaintiff should be observed for difficulty breathing and wheezing. DE 73 at ¶ 66; DE 75 at ¶ 66. Three days later, Future Care requested a status report concerning the plaintiff, to which the Captain responded that the plaintiff had no shortness of breath, was "now feeling fine," and that the swelling had fully resolved. *Id*. Meanwhile, the plaintiff and several crewmen testified that the swelling had not abated, and appeared to have grown more serious. *Id.* at ¶¶ 66–67. The chief mate offered testimony that, during the few days the ship was anchored in Sudan, he observed the swelling in plaintiff's legs and plaintiff complained of breathing difficulties and fatigue. *Id.* at ¶ 67. After some additional

complaints to the Captain, Future Care was again engaged via email around October 16, but there is evidence that the Captain may have incorrectly provided information about plaintiff's condition, even though plaintiff complained daily about shortness of breath and continued swelling. *Id.* at ¶¶ 68–69.

The Captain denies that plaintiff made such complaints, or that plaintiff requested medical care. *See*, *e.g.*, DE 73 at ¶ 69. Defendants do, however, acknowledge several incongruities in the situation. First, it appears undisputed that an officer on the ship (possibly at the Captain's instruction) provided plaintiff with an expired asthma inhaler—apparently in a misguided effort to help him with his breathing difficulties. *Id.* Second, Captain McAuliffe acknowledged in sworn testimony that a number of matters concerning plaintiff were not recorded in the ship's medical log, though such matters "should have been." *Id.* This log contains entries relating to other seamen concerning far less serious medical matters, such as the dispensing of aspirin and antacids and application of bandages. *Id.* Third, Captain McAuliffe inquired of the chief mate whether he believed plaintiff was "faking" his symptoms, but was assured that the symptoms observed could not be faked. *Id.* at ¶ 67.

It is clear that plaintiff's condition worsened, and it was not until October 30, 2013, when the ship was off the coast of Portugal, that Adams was evacuated from the ship and treated for several conditions, including pneumonia and various cardiac ailments. *Id.* at ¶ 7. There, he was treated by Dr. Duarte, an emergency medicine specialist, while his long-term cardiac care was handled by Dr. Chang. Also important to the resolution of these motions are the undisputed facts that Future Care contracted with Liberty Marine to provide telephonic medical advice through a network of physicians, all of whom were independent contractors. DE 71-2 at ¶¶ 55–69. This included the physician in question, Dr. Bourgeois, about whose medical advice plaintiff now

6

complains. *Id.*

## DISCUSSION

### 1. Testimony by Plaintiff's Treating Physicians

Defendants have moved to preclude expert testimony by plaintiff's treating physicians. Both parties rely extensively on Judge Cogan's excellent decision in *Pierce v. City of New York*, No. 16 CIV. 5703 (BMC), 2017 WL 2623857 (E.D.N.Y. June 16, 2017). Like *Pierce*, this case involves potential testimony by treating physicians, and the extent to which those witnesses may render expert opinions. There are, though, a number of factors that distinguish this case from *Pierce*. Procedurally, in *Pierce*, Judge Cogan lamented that "issues were raised to me well after discovery had ended, as we approached trial, the only option available was to limit the testimony that plaintiff could provide." *Pierce,* 2017 WL 2623857, at *4. Here, by contrast, these issues have been before the Court for some time, which permitted, for example, the *de bene esse* deposition of Dr. Duarte. While this deposition was conducted over defendants' objection, it afforded defendants a fair opportunity to explore Duarte's potential testimony and created a much fuller record.

Substantively, the factual situation here, at least with respect to Dr. Duarte, is far different than that which confronted Judge Cogan in *Pierce*. In that case, "the Court had serious concerns about the reliability of the opinions that would be based thereon, given the 13-month gap between the September 1, 2014, incident and Sternberg's first appointment with plaintiff." *Id.* at *3. Here, by contrast, Dr. Duarte, an anesthesiologist and emergency medicine specialist, treated plaintiff during the critical time frame. Defendants seem to contend that Dr. Duarte must be limited to precisely those facts contained in the medical records of his treatment of the plaintiff. The Court believes, however, that the Court may afford him some latitude—depending, of course, on facts

7

elicited at trial—to opine on questions of causation and exacerbation that would reasonably fall within his area of expertise and based principally upon his observations and treatment of plaintiff.

An example may help. Defendants' object to Duarte's testimony that the tests he administered seemed consistent with a cardiac disorder that probably lasted over several weeks' duration, and that complaints of lower limb swelling from several weeks earlier would be consistent with, and buttress, this conclusion. DE 71-1 at ¶¶ 11–12; DE 71-2 at ¶¶ 24–26; DE 73, ¶¶ 24–26. Particularly where, as here, there is some (albeit disputed) evidence that plaintiff complained of swelling several weeks earlier, *see*, *e.g.*, DE 74-3 at 18 (witness testifying about observations of plaintiff's swollen legs when ship in Port of Sudan), it seems reasonable—depending on the testimony elicited at trial—to permit Dr. Duarte to offer such testimony. *Salas v. United States*, 165 F.R.D. 31, 33 (W.D.N.Y. 1995) ("As a general rule, a treating physician considers not just the plaintiff's diagnosis and prognosis, but also the cause of the plaintiff's injuries"). Based on this example, this does not appear to be a situation in which "there is simply too great an analytical gap between the data and the opinion proffered." *Pierce*, 2017 WL 2623857, at *4 (quoting *General Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997)). Of course, "additional evidence might result in a different outcome." *Zanowic v. Ashcroft,* No. 97 Civ. 5292 (JGK) (HBP), 2002 WL 373229, at *3 (S.D.N.Y. Mar. 8, 2002).

Indeed, perhaps the most critical difference between this case and the situation in *Pierce* is the absence of a jury. In *Pierce*, an overriding concern raised by Judge Cogan was whether "permitting plaintiff's treating physicians to offer causation testimony, without the benefit of genuine expert witness discovery, risked misleading the jury and unfairly prejudicing defendants." *Pierce* 2017 WL 2623857, at *2; *cf. id.* at *4 (finding certain proffered testimony to be "patently unreliable [that] risked misleading the jury). Here, by contrast, the parties have consented to try

this case without a jury. In a different case, Judge Cogan observed in the context of a bench trial that "without the risk of poisoning the jury with misleading expert testimony of limited probative value, the Court can take in the evidence freely and separate helpful conclusions from ones that are not grounded in reliable methodology." *Joseph S. v. Hogan*, No. 06 Civ. 1042 (BMC) (SMG), 2011 WL 2848330, at *3 (E.D.N.Y. July 15, 2011). As another district judge observed:

> In order for expert testimony to be admitted, Rule 702 requires that an expert's "specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue," that "the testimony is based on sufficient facts or data" and "is the product of reliable principles and methods," and that "the expert has reliably applied the principles and methods to the facts of the case." Fed. R. Evid. 702. In determining the admissibility of an expert witness's testimony, a court must "undertake a rigorous examination of the facts on which the expert relies, the method by which the expert draws an opinion from those facts, and how the expert applies the facts and methods to the case at hand." *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 267 (2d Cir. 2002). However, "in accordance with the liberal admissibility standards of the Federal Rules of Evidence, only serious flaws in reasoning or methodology will warrant exclusion." *In re Fosamax Prods. Liab. Litig.*, 645 F.Supp.2d 164, 173 (S.D.N.Y. 2009). This is especially true in the context of a bench trial, where "there is no possibility of prejudice, and no need to protect the factfinder from being overawed by 'expert' analysis." *Victoria's Secret Stores Brand Mgmt., Inc. v. Sexy Hair Concepts, LLC,* 07 Civ. 5804, 2009 WL 959775, at *8 n. 4 (S.D.N.Y. Apr. 8, 2009). Particularly in a bench trial, "[v]igorous cross-examination, presentation of contrary evidence, and careful ... [attention to] the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 596, 113 S. Ct. 2786, 125 L.Ed.2d 469 (1993).

*Assured Guar. Mun. Corp. v. Flagstar Bank*, *FSB*, 920 F. Supp. 2d 475, 502 (S.D.N.Y. 2013).

In their effort to exclude the subject testimony, defendants rely heavily upon plaintiff's failure to provide an expert report consistent with Rule 702. However, "[a]s explained in the Advisory Committee Notes, this language excludes treating physicians: 'A treating physician, for example, can be deposed or called to testify at trial without any requirement for a written report.'" *Salas v. United States*, 165 F.R.D. 31, 33 (W.D.N.Y. 1995). Significantly, the Court finds that any prejudice that could have resulted from the absence of such disclosure was largely ameliorated in

9

the case of Dr. Duarte by the deposition conducted, at which time defendants were provided with far more information than would have been provided in an expert report and an opportunity to cross-examine the witness as to his conclusions and opinions. As to Dr. Chang, defendants opposed that deposition to prevent the preservation of testimony that would have substituted for the doctor's appearance at trial. *See* DE 63. Having opposed the deposition, it seems somewhat inconsistent to now assert that they have not had sufficient opportunity to explore his testimony. As this Court has already ruled, Dr. Chang may testify at trial and defendants remain free to make any motions regarding that testimony.

### 2. The Medical Log

Defendants argue that the medical log in which, plaintiff alleges, the Captain failed to keep records of plaintiff's illness is "not negligence *per se*," contending that the medical log is not part of the "Official Log Book," and is not governed by Coast Guard regulations. See DE 71-1 at 14–15. For his part, plaintiff argues that Coast Guard regulations require that a log be kept of crew injuries, and defendants' violation of those regulations caused his injuries. DE 72 at 15–16. However, as defendants note, the medical log is an internal record keeping document, and is different than the official log book, which was submitted to the Coast Guard in accordance with Coast Guard regulations. DE 71-1 at 15, n.10. Furthermore, plaintiff has not proffered evidence that any violations related to record keeping requirements caused his injuries. *See Johnson v. Horizon Lines, LLC*, 520 F. Supp. 2d 524, 527 (S.D.N.Y. 2007) (holding that a regulatory violation could amount to negligence *per se* only if a plaintiff proved "(1) a violation of Coast Guard regulations; (2) the plaintiff's membership in the class of intended beneficiaries of the regulations; (3) an injury of a type against which the regulations are designed to protect, (4) the unexcused nature of the regulatory violation, *and (5) causation*") (emphasis added). It cannot be said that a

failure to record an injury after the fact caused the underlying injury. To be clear, this determination will not affect the Court's evidentiary rulings, as the medical log may well be probative evidence of other matters, and the Court will rule on the admissibility of the log, if offered, at the time of trial.

3. **Claims against Future Care, Inc.**

While plaintiff attempts to maintain his negligence claims against Future Care, Inc., it is undisputed that this entity engaged independent contractor-physicians to dispense medical advice. Thus, Future Care argues that, among other issues, the claims against it are barred by the general proposition that an entity is not liable for a tort committed by an independent contractor. *See*, *e.g.*, *Tesillo v. Emergency Physician Assocs., Inc.,* 376 F. Supp. 2d 327, 330 (W.D.N.Y. 2005) (holding, in the context of a physician serving as an independent contractor to a hospital corporation, that "the employer of an independent contractor is not liable for the torts of that contractor or its servants"). Plaintiff's claims against Future Care are further undermined by his contention that Captain McAuliffe provided false information to Dr. Bourgeois, which belies the claims that the doctor provided negligent medical advice. DE 73 at ¶¶ 63–68. Plaintiff provides no contrary authority on these points. Therefore, Future Care is entitled to summary judgment.

4. **Claims for Maintenance and Cure**

On this motion, defendant Liberty seeks summary judgment as to plaintiff's claims for the costs of "maintenance" and "cure." The Supreme Court has discussed "[t]he ancient duty of a vessel and her owner to provide maintenance and cure for seamen injured or falling ill while in service," noting:

> The duty, which arises from the contract of employment, does not rest upon negligence or culpability on the part of the owner or master, nor is it restricted to those cases where the seaman's employment is the cause of the injury or illness. It is not an award of compensation for the disability suffered, although breach of the duty

11

may render the owner liable for the consequential damages suffered by the seaman. The maintenance exacted is comparable to that to which the seaman is entitled while at sea, and 'cure' is care, including nursing and medical attention during such period as the duty continues.

*Calmar S. S. Corp. v. Taylor*, 303 U.S. 525, 527–28 (1938) (citations omitted). Far more recently, the Second Circuit examined this doctrine in detail, observing:

> A claim for maintenance and cure concerns the vessel owner's obligation to provide food, lodging, and medical services to a seaman injured while serving the ship. The doctrine entitles an injured seaman to three district remedies—maintenance, cure, and wages. "Maintenance" compensates the injured seaman for food and lodging expenses during his medical treatment. "Cure" refers to the reasonable medical expenses incurred in the treatment of the seaman's condition. And lost wages are provided in addition to maintenance, on the rationale that maintenance compensates the injured seaman for food and lodging, which the seaman otherwise receives free while on the ship.
>
> The obligation to provide maintenance and cure payments, however, does not furnish the seaman with a source of lifetime or long-term disability income. A seaman is entitled to maintenance and cure only until he reaches maximum medical recovery. Put another way, maintenance and cure continues until such time as the incapacity is declared to be permanent. However, where a seaman has reached the point of maximum medical cure and maintenance and cure payments have been discontinued, the seaman may nonetheless reinstitute a demand for maintenance and cure where subsequent new curative medical treatments become available.
>
> [M]aintenance and cure has been called a kind of nonstatutory workmen's compensation. The analogy to workers' compensation, however, can be misleading, because maintenance and cure is a far more expansive remedy. First, although it is limited to the seaman who becomes ill or is injured *while in the service of the ship,* it is not restricted to those cases where the seaman's employment is the cause of the injury or illness. The obligation can arise out of a medical condition such as a heart problem, a prior illness that recurs during the seaman's employment, or an injury suffered on shore. Second, the doctrine is so broad that negligence or acts short of culpable misconduct on the seaman's part will not relieve the shipowner of the responsibility. [And] a seaman may be entitled to maintenance and cure even for a preexisting medical condition that recurs or becomes aggravated during his service.
>
> No matter how the doctrine is formulated, one thing is clear—the duty of maintenance and cure exists for the benefit of seamen. Accordingly, the Supreme Court instructs us to be liberal in interpreting this duty for the benefit and protection of seamen who are the admiralty courts' wards. A shipowner's liability for maintenance and cure is among the most pervasive of all and is not to be defeated

by restrictive distinctions nor narrowly confined. Thus, when there are ambiguities or doubts, they are resolved in favor of the seaman.

*Messier v. Bouchard Transp.,* 688 F.3d 78, 81-83 (2d Cir. 2012), *as amended* (Aug. 15, 2012) (citations and alterations omitted).

In this case, it is undisputed that, according to Dr. Chang, plaintiff reached the point of "Maximum Medical Improvement," by December 22, 2014. DE 71-2 at ¶ 75. The principal question presented on this motion is whether Adams is entitled to pursue Liberty for the medical expenses up to that point, which total $300,111.32, and were paid by the plaintiff, his union and/or the union's insurer. *See* DE 73 at ¶ 76. In his response to the motion, invoking the collateral source doctrine, plaintiff argues that he is entitled to sue Liberty for the entire amount, including the expenses assumed by the union and the insurer. That argument fails because, as the Second Circuit has held "a seaman's right to cure is not subject to the collateral source rule." *Moran Towing & Transp., Co. v. Lombas*, 58 F.3d 24, 27 (2d Cir. 1995) (noting that the "purpose of cure is purely compensatory and . . . restricts a seaman's recovery to only out-of-pocket 'cure' expenses [thus] a vessel owner has no obligation to provide maintenance and cure if it is furnished by others at no expense to the seaman").

That does not end the inquiry, however, as on this motion plaintiff has submitted documentary evidence revealing that he was obligated to pay some portion of the medical expenses on an out-of-pocket basis. DE 74, Ex. G. Thus, while defendants are correct that plaintiff may not recover those sums paid by third parties, plaintiff is entitled to seek recovery for the amounts for which he paid or remains obligated. In addition, the record is devoid of evidence concerning amounts, if any, which Liberty might owe the plaintiff for unpaid maintenance, rather than cure. Admissible evidence of these sums may be offered at trial.

**5. Punitive Damages and Attorney's Fees**

Defendant Liberty moves for summary judgment on the issue of punitive damages and attorney's fees with respect to plaintiff's claim under the Jones Act. Defendants do not, as it appears they cannot, move for such relief with respect to Captain McAuliffe. For avoidance of doubt, the critical facts underlying such an award are, in large measure, subject to factual dispute. However, if plaintiff is able to prove at trial that, as has been asserted, defendants willfully denied him access to medical assistance, communicated false information about his condition to medical providers, and/or avoided recordkeeping in an effort to conceal this conduct, such actions may, upon further review, provide a sufficient factual predicate to consider an award of punitive damages and/or legal fees.[2] Thus, the Court must determine whether such a claim may be legally viable.

The basis for a claim for punitive damages and legal fees, emanating from a failure to properly provide maintenance and cure, are deeply rooted in the law. As the Supreme Court has observed:

> the failure of a vessel owner to provide proper medical care for seamen has provided the impetus for damages awards that appear to contain at least some punitive element. For example, in *The City of Carlisle*, 39 F. 807 (DC Ore. 1889), the court added $1,000 to its damages award to compensate an apprentice seaman for "gross neglect and cruel maltreatment of the [seaman] since his injury." *Id.,* at 809, 817. The court reviewed the indignities to which the apprentice had been subjected as he recovered without any serious medical attention, *see id.*, at 810–812, and explained that "if owners do not wish to be mulct[3] in damages for such misconduct, they should be careful to select men worthy to command their vessels and fit to be trusted with the safety and welfare of their crews, and particularly apprentice boys." *Id.*, at 817; *see also The Troop*, 118 F. 769, 770–771, 773 (D.C. Wash. 1902) (explaining that $4,000

---

[2] Another factual dispute, to wit: evidence concerning whether plaintiff's knowledge of "bucket discharge" was singular and critical to the ship's operation—may be relevant to potential liability of Liberty—as it may demonstrate that McAuliffe's alleged actions delaying his medical evacuation furthered the interests of the shipowners.

[3] The somewhat archaic term "mulct" (sometimes seen as "mulked" or the "mulcted") refers to the imposition of a fine as punishment. *See* OXFORD ENGLISH DICTIONARY, *available at* https://www.oed.com/view/Entry/123413?rskey=3DCmPt&result=1&isAdvanced=false#eid.

> was a reasonable award because the captain's "failure to observe the dictates of humanity" and obtain prompt medical care for an injured seaman constituted a "monstrous wrong")
>
> The settled legal principles discussed above establish three points central to resolving this case. First, punitive damages have long been available at common law. Second, the common-law tradition of punitive damages extends to maritime claims. And third, there is no evidence that claims for maintenance and cure were excluded from this general admiralty rule. Instead, the pre-Jones Act evidence indicates that punitive damages remain available for such claims under the appropriate factual circumstances. As a result, respondent is entitled to pursue punitive damages unless Congress has enacted legislation departing from this common-law understanding. As explained below, it has not.

*Atl. Sounding Co. v. Townsend*, 557 U.S. 404, 414–15 (2009); *cf. Moran Towing & Transp., Co. v. Lombas,* 58 F.3d 24, 26 (2d Cir. 1995) ("The Supreme Court in ruling that a seaman was entitled to reasonable attorney's fees as damages for the shipowner's failure to pay for maintenance, has clarified that the right of maintenance and cure is not purely contractual in nature."). Quite recently, the Second Circuit confirmed the availability of legal fees and punitive damages, specifically in the context of improper failure to pay maintenance and cure. *Hicks v. Tug PATRIOT*, 783 F.3d 939, 945 (2d Cir. 2015) ("*Atkinson's* holding that an award for attorney's fees may be made where the refusal to pay maintenance and cure was 'callous,' 'willful,' and 'persistent' is not inconsistent with a punitive award [and] counsel fees are available for a willful breach of an employer's maintenance and cure obligations").

Liberty argues that it is entitled to summary judgment on these claims principally because, as the shipowner, it may be liable for punitive damages and legal fees only where there is evidence that it ratified the actions of its agent—in this case, Captain McAuliffe. While the amended complaint generally alleges negligent hiring on the part of Liberty, there are no facts alleged, nor evidence presented, that would suggest that there was any reason to question the competence of Captain McAuliffe at the time he was employed by Liberty. Thus, there is no basis for a claim of

negligent hiring against Liberty. That does not, however, end the inquiry.

Some of the language in the applicable caselaw could suggest a lesser standard, such as the Supreme Court's relatively recent reinvocation of the caution that "'if owners do not wish to be mulct in damages for such misconduct, they should be careful to select men worthy to command their vessels and fit to be trusted with the safety and welfare of their crews.'" *Townsend*, 557 U.S. at 414 (quoting *The City of Carlisle,* 39 F. 807). Courts have differed on the extent to which shipowners may be vicariously liable for the acts of their agents. *Stepski v. M/V NORASIA ALYA,* No. 7:06-CV-01694, No. 2010 WL 6501649, at *10 (S.D.N.Y. Jan. 14, 2010) ("The Circuit Courts are divided over the standard by which a shipowner may be vicariously liable in punitive damages for the conduct of his agent under the general maritime law"). Interestingly, at least one of these cases—the Ninth Circuit's application of vicarious liability to a shipowner corporation—observed the following:

> We agree that a corporation can act only through its agents and employees, and that no reasonable distinction can be made between the guilt of the employee in a managerial capacity acting within the scope of his employment and the guilt of the corporation. 22 Am.Jur.2d, Damages § 261 (1965). It seems obvious that *no corporate executive or director would approve the egregious acts to which punitive damages would attach and, therefore, no recovery for more than compensatory damages could ever be had against a corporation if express authorization or ratification were always required*.

*Protectus Alpha Nav. Co. v. N. Pac. Grain Growers, Inc.,* 767 F.2d 1379, 1386 (9th Cir. 1985) (emphasis added). The present circumstances, in which misconduct is alleged on the part of a ship's captain, turns that assumption on its head—if the captain acts in a managerial capacity, his acts could result in corporate liability without ratification. This question was presented to the Supreme Court in *Exxon Shipping Co. v. Baker*, 554 U.S. 471 (2008), in which one party argued that "*Lake Shore* [*& M.S. Ry. Co. v. Prentice*, 147 U.S. 101 (1893)] merely rejected company liability for the acts of a railroad conductor, while saying nothing about liability for agents higher

up the ladder, *like ship captains*." (emphasis added). Remarkably, the Supreme Court left the question unanswered, noting that the Court was "equally divided on this question [and] the disposition here is not precedential on the derivative liability question." *Baker*, 554 U.S. at 484.

The question then arises as to whether Captain McAuliffe is, as a legal matter, a managerial employee whose actions could warrant the imposition of vicarious liability. At first glance, the answer may seem obvious. Common parlance[4] and venerable legal precedent[5] suggest that the captain of a ship wields vast authority, and it would seem logical to conclude that such an officer would be the very person through which a shipowner-corporation acts during a voyage. Courts are sharply divided on the issue, however, as described by the First Circuit:

> We [have] discussed three approaches courts have taken when addressing the liability of a principal who neither authorizes nor ratifies her agent's misconduct. Under the majority approach, punitive damages are treated indistinguishably from compensatory ones, and traditional *respondeat* liability attaches. Principals are held accountable for their agents' misdeeds that occur within the scope of employment. In contrast, a significant minority of courts follow the strict complicity rule of *Lake Shore & M.S.R. Co. v. Prentice,* 147 U.S. 101, 13 S.Ct. 261, 37 L.Ed. 97 (1893), which limits principal liability to those acts participated in, authorized or ratified. Finally, the Restatement rule incorporates the *Lake Shore* limitation but extends liability, regardless of authorization or ratification, to acts committed by a managerial agent within the scope of employment.

---

[4] The Oxford English Dictionary, as relevant here, defines "captain" as "[t]he master or commander of a merchant ship or of any kind of vessel," or more generally as "[o]ne who stands at the head of others and leads them, or exercises authority over them; a headman, chief, or leader." *See* OXFORD ENGLISH DICTIONARY, *available at* https://www.oed.com/view/Entry/27616?rskey=4Fk6KC&result=1&isAdvanced=false#eid.

[5] "Pursuant to [] long standing tradition, a ship's captain is the ship's master." *Spentonbush/Red Star Cos. v. N.L.R.B.,* 106 F.3d 464, 488 (2d Cir. 1997). "The Master has full authority over all officers and unlicensed personnel on the vessel and his orders must be obeyed in spirit and to the letter by all persons on board." *Id.* at 489 (citation omitted); *see also Coastal Iron Works, Inc. v. Petty Ray Geophysical, Div. of Geosource, Inc*., 783 F.2d 577, 582 (5th Cir. 1986) ("A ship's captain is master of his vessel in every sense of the word"); *Avera v. Fla. Towing Corp*., 922 F.2d 155, 164 (5th Cir. 1963) (the captain is the one "to whom the law looks as the Lord of the Quarterdeck"); *Kennerson v. Jane R., Inc*., 274 F. Supp. 28 (S.D. Tex. 1967) ("A 'Master' or 'Captain' is he to whom are committed the government, care, and direction of the vessel and cargo. He is one who, for his knowledge of navigation and for his fidelity and discretion, has the government of the ship committed to his care and management").

*CEH, Inc. v. F/V Seafarer*, 70 F.3d 694, 703 (1st Cir. 1995) (alterations omitted); *cf. Stepski v. M/V NORASIA ALYA*, 2010 WL 6501649, at *10 (S.D.N.Y. 2010) ("The Circuit Courts are divided over the standard by which a shipowner may be vicariously liable in punitive damages for the conduct of his agent under the general maritime law"). The First Circuit adopted a hybrid version of these approaches, formulating a rule that imposes "vicarious liability on a principal for the act of an agent employed in a managerial capacity and acting in the scope of employment" and concluded that this approach "represents an appropriate evolution of the *Lake Shore* rule, at least when linked to requiring some level of culpability for the misconduct." *CEH*, 70 F.3d at 705. The parties have not submitted, and independent research has not revealed any Second Circuit guidance as to which approach constitutes the law in this Circuit.

Several of these approaches are highly fact intensive. For example, *CEH* upheld exemplary awards against Doyle, the shipowner, and Niles, a ship's officer (who served both as captain and first mate), only after reviewing the detailed factual findings:

> Whatever the outer parameters of "managerial capacity" liability may be, the district court supportably found that the circumstances here justified the imposition of punitive damages against Doyle. In so concluding, the district court discussed at some length the intertwined issues of Niles' managerial authority and Doyle's culpability in failing to supervise Niles. Niles had total authority to hire and fire the crew, to determine the duration, location and targets of the trips, and to sell the catch wherever he chose. In short, Niles had "complete managerial discretion over the means and methods of fishing." Niles set forth and implemented whatever policy, if any, the crew of the SEAFARER followed. Moreover, the decisions made by Niles directly affected the success of Doyle's fishing business. This delegation of complete managerial discretion was made notwithstanding Doyle's knowledge that "he had hired his captains to work in an atmosphere characterized in part by the tension that raged between lobstermen and draggers." Not only was there a complete delegation of authority in a troublesome work situation, but also a complete absence of any policy directive, written or oral, regarding the operation of Doyle's vessels in lobster trawl areas. This combination of circumstances places this case well within the sphere of culpability.

*CEH*, 70 F.3d at 705. In this case, the determination as to which of the approaches to shipowner liability is warranted should be made upon a fuller record after appropriate factual findings have

been made at trial. Therefore, the motion seeking summary judgment as to legal fees and punitive damages as to defendant Liberty is denied.

## CONCLUSION

Based on the foregoing, and subject to the conditions described herein, it is ORDERED as follows:

1. Defendants' motion to exclude certain testimony by plaintiff's treating physicians is DENIED;

2. Defendants' motion for summary judgment as to any claim of negligence *per se* arising from omissions in the ship's medical log is GRANTED;

3. Defendant Future Care's motion for summary judgment is GRANTED in all respects;

4. Defendants' motion for summary judgment as to plaintiff's claim for maintenance and cure is GRANTED as to all amounts paid by third parties, but is otherwise DENIED; and

5. Defendant Liberty's motion for summary judgment regarding punitive damages and legal fees is DENIED pending trial of this action.

Counsel for the parties are hereby DIRECTED to meet and confer forthwith to supply the Court with dates for submission of a pre-trial order and dates for trial of the case, which should follow in short order. As such, the parties should supply a joint status report within ten days of the date of this Memorandum and Order.

SO ORDERED.

Dated: Central Islip, New York
September 12, 2019

/s/ Gary R. Brown
GARY R. BROWN
United States Magistrate Judge