UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------X
FRANCIS ADAMS,

                              Plaintiff,

                                                    **MEMORANDUM &**
                                                    **ORDER**,

                                                    No. 16-CV-5352 (GRB)

            -against-


LIBERTY MARITIME CORPORATION,
FUTURE CARE, INC., and CAPTAIN JOHN
JOSEPH MCAULIFFE,

                              Defendants.
---------------------------------------------------------X
**GARY R. BROWN, United States District Judge.**

        This matter is before the Court following a bench trial resulting from the consent of the

parties to the undersigned, then serving as a magistrate judge, for all purposes. Subsequently, the

undersigned was confirmed as a United States District Judge. However, in the interests of

judicial economy, the undersigned retained jurisdiction over this matter pending its resolution.

For the reasons discussed herein, the Clerk of the Court will be directed to enter judgment in

favor of the plaintiff to the extent described below.


                              I. PROCEDURAL HISTORY


        Plaintiff Francis Adams ("Adams") filed this suit against his former employer, defendant

Liberty Maritime Corporation ("Liberty"), his former supervisor, defendant Captain John

McAuliffe, and Liberty's telemedicine contractor, Future Care, Inc. ("Future Care"), for injuries

that allegedly resulted from events that occurred in October 2013 upon Liberty's vessel, the *Liberty*

*Eagle*. Plaintiff's claims against Future Care were dismissed at summary judgment, as were

Plaintiff's negligence *per se* claims and Plaintiff's claim for maintenance and cure for all amounts

paid by third parties. *See* Docket Entry ("DE") 81. This left Plaintiff's claims for unseaworthiness

against defendant Liberty, for maintenance and cure against defendant Liberty, and for negligence

under the Jones Act against both remaining defendants. A bench trial was held before the undersigned over four days in December 2019. This opinion follows.

## II. FINDINGS OF FACT

After careful evaluation of the testimony presented at trial, assessment of the credibility of the witnesses and review of the exhibits admitted into the record, I find the evidence establishes the following facts:

In the fall of 2013, the *Liberty Eagle*, a bulk carrier vessel operated by defendant Liberty, picked up its crew, including Adams and defendant Captain John McAuliffe. *Trial at 27, 31, 251*. After picking up the crew, the vessel sailed to Houston, Texas and loaded a humanitarian cargo of sorghum destined for the Port of Sudan. *Id. at 26-27; Mallory Deposition at 16; Otumfo Deposition at 9*.

At that time, Adams was a 59-year-old able-bodied ("AB") seaman, a level above ordinary seaman. *Trial at 22, 121*. However, for this voyage (as on previous voyages), Adams took on the additional role of bosun (or "boatswain"), a position that entails supervisory responsibilities over the other ABs in the deck department, including cargo discharge as well as maintenance and repair of equipment.[1] *Id. at 24; Mallory Deposition at 12; Otumfo Deposition at 8-9, 45*. As bosun, Adams reported to the chief mate, Paul Mallory. *Trial at 252*. At this point, Adams was known to have underlying conditions of high blood pressure and diabetes. *Id. at 411; Dr. Duarte Deposition at 27*. Nevertheless, after physical examinations of Adams taken by his own doctor as well as the Coast Guard, his union, and Liberty itself, Adams was ultimately deemed fit for duty. *Trial at 27-29; Plaintiff's Exhibits 6, 31*.

After picking up crew and provisions, the *Liberty Eagle* departed from Texas in September and began its voyage to Sudan. *Trial at 27; Otumfo Deposition at 9*. Around the time that the

---

[1] A bosun is also the level above AB seaman, and is thus separately a rating and (as here) a job that is taken by the lead AB. *Trial at 121, 253*.

*Liberty Eagle* was approaching the Port of Sudan, near the beginning of October, Adams began to experience swelling and pain in his legs and feet. *Trial at 41, 43, 187, 253; Otumfo Deposition at 11-12, 29, 51; Plaintiff's Exhibit 2.* On October 3rd, Adams reported this condition to the chief mate and the third mate medical officer, who then reported the issue to the captain. *Trial at 43-45.* Adams spoke with Captain McAuliffe shortly thereafter, at which time the captain took photographs of Adams's feet and legs. *Id. at 47-49, 141, 258.* The captain then emailed Future Care, Liberty's telemedicine services provider, with details of Adams's complaints, his vital signs—including high blood pressure and a high pulse—and the pictures of his legs, with the note that the swelling "started two days ago."[2] *Id. at 50, 141-43, 254, 259, 317; Dr. Bourgeois Deposition at 53-54; Plaintiff's Exhibit 2.*

Future Care then relayed this information to Dr. Brian Bourgeois, a physician engaged by Future Care to provide medical advice to Future Care's clients.[3] *Dr. Bourgeois Deposition at 15, 18.* Dr. Bourgeois then responded—in a message also conveyed via Future Care—diagnosing Adams with venous stasis disease, a chronic vein disease "not specifically treatable with medication." *Trial at 259, 264; Plaintiff's Exhibit 2.* Dr. Bourgeois further advised that Adams should soak his feet with Epsom salt, but that "[n]o other treatment is indicated" and that Adams could continue to work. *Trial at 264; Plaintiff's Exhibit 2.* However, Dr. Bourgeois also advised the captain to confirm that Adams had no difficulty breathing when sleeping or climbing stairs, and to check Adams's breathing "for any wheezing or rough crackles." *Trial at 261, 296; Plaintiff's Exhibit 2.* Dr. Bourgeois failed to explain the purpose of this additional inquiry.

Dr. Bourgeois ultimately testified at his deposition that he had raised these secondary questions about Adams's breathing because Adams's symptoms had also presented "in [his] mind" a "differential diagnosis"[4] of congestive heart failure. *Dr. Bourgeois Deposition at 59-60.* Dr.

---

[2] Liberty had contracted with Future Care to provide medical support services for its ships, including the *Liberty Eagle*. *Trial at 346-47.* While the parties dispute the precise nature of these services—addressed in further detail below—it is nevertheless evident that Future Care provided *some* form of telemedicine services to Liberty's vessels, including the *Liberty Eagle. Id. at 346.*

[3] Dr. Bourgeois was, in fact, the lead physician with Future Care's "international shipboard medical call line." *Dr. Bourgeois Deposition at 14.*

[4] As explained by Defendants' medical expert, a differential diagnosis demonstrates that a doctor is "trying to decide . . . what is the most likely diagnosis" among multiple possible diagnoses that could explain the problems presented. *Trial at 397.*

Bourgeois explained that such breathing issues, in conjunction with the reported swelling and Adams's preexisting hypertension (i.e., high blood pressure) and diabetes, would be "the kind of classic presentation symptoms of someone with congestive heart failure." *Id. at 23-24*. Indeed, in his testimony, he conceded that swelling caused by venous stasis disease—the only diagnosis he presented to the Captain—"take[s] a fairly long time to develop" and doesn't occur overnight. *Id. at 25*. The fact that Adams's swelling began only two days prior, then, would seem to justify more serious consideration of the differential diagnosis, especially one as consequential as congestive heart failure. However, Dr. Bourgeois failed to inform anyone on the *Liberty Eagle* of his differential diagnosis, relying instead on examination by maritime officers with little to no medical training to gather and report additional data that would bear on his theory, but without advising anyone as to the purpose of this endeavor. *Trial at 334-36; Plaintiff's Exhibit 2*.

Captain McAuliffe showed Adams the response from Dr. Bourgeois diagnosing only venous stasis disease, and—per the doctor's orders—checked Adams's breathing by placing a stethoscope on his chest and back (although where exactly on his chest or back, the captain could not say).[5] *Trial at 50, 142, 260, 262, 265, 296, 334-36*. Adams was then provided with Epsom salt, which ultimately helped to reduce the swelling at night, but did not prevent the swelling from returning during the day. *Id. at 52-55; 145-46*. Captain McAuliffe reported to Future Care later that day that the swelling had gone down with the Epsom salt soak and the pain had disappeared, but he neglected to report on Adams's breathing as requested. *Plaintiff's Exhibit 2*. Dr. Bourgeois therefore reached out again a few days later, on October 6th, inquiring as to Adams's current status. *Trial at 300; Plaintiff's Exhibit 2*. Captain McAuliffe responded later that day that Adams "ha[d] no shortness of breath" and that his breathing "ha[d] no indication of wheezing or rough crackles." *Trial at 300-01; Plaintiff's Exhibit 2*.

Unfortunately, Adams's problems did not end there. By October 16th, Adams was experiencing new symptoms, including fatigue and rib pain on his left side, which he reported to

---

[5] Defendants' own medical expert testified that someone who uses a stethoscope "need[s] to have training" to "know what to listen for" and to "know where to put the stethoscope," as placement of the stethoscope "depends [on] what you're listening for." *Trial at 437*. The evidence suggests that neither Captain McAuliffe nor anyone else on the crew had such training (or if they had, they couldn't recall enough to apply it). *Id. at 334-36*. Defendants' expert further stated that, for "a full lung exam," one would also need to place the stethoscope on the patient's side, not just their chest and back. *Id. at 438*.

the ship's officers. *Trial at 55-57, 62-63, 266*. Captain McAuliffe contacted Future Care that day, stating that Adams was experiencing "[i]ntermittent sharp pain at bottom lower right rib cage" that "feels like a sharp gas pain," but that there was "[n]o pain when breathing in or out." *Id. at 267-68; Plaintiff's Exhibit 2*.

However, it appears that Adams also reported difficulty breathing—and may, in fact, have reported such difficulty as far back as October 3rd. *Trial at 150-51*; *Adams Deposition at 147-48*. While the precise timing is not clear, what is critical is the fact that Adams appears to have developed shortness of breath far before October 30th. To be sure, the parties' testimony conflicts on this point: while Adams stated that he began having trouble as early as the 3rd, Captain McAuliffe asserted that Adams did not report trouble breathing until the 30th. *Trial at 150-51, 264, 271, 279, 287*. The captain further claimed that, when shown the communications with Future Care on the 3rd and 16th, Adams did not say that the responses from Future Care were incomplete. *Id. at 265, 267, 271*. However, there is ample reason to find the captain's testimony on this subject to be less than credible:

First, Captain McAuliffe appears to have withheld information from Future Care regarding the swelling in Adams's legs—raising questions about the accuracy of his reporting regarding Adams's breathing problems. Dr. Bourgeois had noted in his email on October 3rd that venous stasis disease was "not specifically treatable with medication," and that Adams's swelling therefore "will resolve when he sleeps" but would nevertheless "worsen when he is on his feet." *Plaintiff's Exhibit 2*. The captain himself admitted that he understood Dr. Bourgeois to mean that "medications [would] not relieve" the swelling and "there's really nothing you can do for it."[6] *Trial at 264, 301-02*. Despite this diagnosis, the captain reported in his email to Future Care on the 6th—without any apparent surprise—that Adams's feet "ha[d] not become swollen" since using Epsom salt on the 3rd. *Plaintiff's Exhibit 2*. Moreover, Adams and multiple other crewmembers, including the chief mate, testified that the swelling had, in fact, recurred after the 3rd. *Trial at 52-55, 57, 145-46; Otumfo Deposition at 14, Mallory Deposition at 34*. The swelling drove Adams to wear sneakers instead of the mandated steel-toed work boots for the rest of his time in the Port, a

---

[6] Defendants' medical expert also conceded that Epsom salt would not relieve swelling associated with venous stasis disease. *Trial at 441*.

circumstance which Adams stated the captain was not only aware of, but personally allowed. *Trial at 43, 53-55, 472*. In fact, the captain's *own* testimony indicates that he was personally aware that the swelling had not abated, even after his second report on the 16th. The captain testified that "in the middle of the month," i.e., "around the 16th or 17th, 18th," he had asked the chief mate whether Adams was faking his symptoms. *Id. at 285, 323; see also Mallory Deposition at 17-18*. According to the captain, the chief mate replied that "[h]is legs are swelled. You can't fake that." *Trial at 285; see also Mallory Deposition at 17-18*. Not that Adams's legs *had been* swollen, but that they *are* swollen; yet Captain McAuliffe also testified that Adams "did not complain about the feet swelling after the first occasion." *Trial at 302*. These inconsistencies, together with the captain's apparent focus on cost containment in these circumstances (discussed further below), raise questions about the veracity of the captain's testimony regarding Adams's symptoms.

Second, there is evidence indicating that the captain should have been aware that Adams had been having difficulty breathing before the 16th, let alone the 30th. Sometime between the captain's report on the 3rd and his report on the 16th, Adams came into possession of an asthma inhaler. *Id. at 57-58, 478*; *Mallory Deposition at 28-29; Otumfo Deposition at 25-26*. The source of the inhaler (i.e., whether it was provided by order of the captain himself) is unclear, but ultimately not dispositive. *Trial at 57-61, 151, 271-73, 327, 478*. Rather, the critical point is that multiple people witnessed Adams using an inhaler,[7] and—given that the crew encountered the captain sporadically throughout each day on the voyage—the captain would have had ample opportunity to observe this himself. *Id. at 36, 56; Mallory Deposition at 28-29; Otumfo Deposition at 25-26*. Even if one were to entirely ignore the testimony indicating that Adams *personally* advised his superiors of his breathing issues multiple times throughout the month,[8] the fact that Adams was using an inhaler should have clearly indicated to the captain that Adams was having breathing problems of some sort.[9]

---

[7] The chief mate was particularly outspoken about the inhaler, because—from his experience with his daughter's asthma—he understood inhalers to be "powerful medicine" that should not be used lightly. *Mallory Deposition at 28-29*.

[8] *Trial at 55-56, 149-52, 188-89; Otumfo Deposition at 15, 39-40, 57; Mallory Deposition at 17*. Of course, the captain testified that Adams made no such complaints. *Trial at 253-54, 263-64, 267, 271*.

[9] A pair of other crewmembers also offered conflicting testimony on Adams's breathing difficulties, although neither crewman's statements on this issue were particularly compelling. Albert Konning testified that he did not observe Adams having any difficulty breathing at any point in the voyage; on the other hand, he also did not recall Adams having swollen legs, using an inhaler, or having any chest pain, all of which indisputably occurred. *Konning*

Finally, there is an unexplained absence of any record of these events in the ship's medical log. Complaints from other crew members—arguably of lesser severity—were regularly recorded into the log: for example, there are records of providing aspirin, or constipation medicine, or a bandage for a scrape, all between September 30th and October 16th. *Trial at 320; Plaintiff's Exhibit 13*. However, there is no record of any of Adams's complaints, or his corresponding treatment, before the 30th. *Trial at 318-320; Plaintiff's Exhibit 13*. The captain himself admitted that he should have recorded these incidents. *Trial at 318-320*. Indeed, given that Adams's issues were evidently much more concerning than the examples above (to the point that multiple communications were exchanged with Future Care), the total failure to enter contemporaneous records for Adams is rather alarming. The meager explanation for such failure, *id. at 318-321*, is even more so.[10]

Each of these factors casts suspicion on Captain McAuliffe's testimony about Adams's breathing difficulties. But the question then arises: why would the captain have withheld this information from Future Care? Plaintiff's counsel claimed that Defendants were loath to risk Adams's departure from the ship due to his supposed expertise in operating the ship's grain buckets, but Adams himself conceded that he was "not an expert bucket man." *Id. at 37*. Rather, the explanation for the captain's omissions in his reports to Future Care is likely much more banal: if Adams had been found unfit for duty, the captain would have had to repatriate him (i.e., remove him from the ship and return him to the U.S.), a procedure of not inconsequential expense and disruption to Liberty. *Id. at 312-13*. Even a comparatively simple matter of shoreside treatment could impose costly delays if the vessel was not near a port at the time. *Id. at 327*. The captain may have appreciated this, given that he expressed skepticism to Adams about the quality of medical care in the Port of Sudan, despite never having been shoreside in the Port himself. *Id. at*

---

*Deposition at 13-16*. Thus, Mr. Konning appears to have hardly observed anything at all—possibly because, as he admitted himself, he "wouldn't want to say anything that would influence adversely [his] relationship with Liberty Maritime." *Id. at 15*. Conversely, Adiawor Otumfo testified that—at some unspecified time—Adams developed shortness of breath, but he appears to have been led to this assertion by Plaintiff's attorney. *Otumfo Deposition at 18-19, 29*.

[10] Captain McAuliffe justifies the failure to record Adams's complaints and treatments by arguing that the ship "ha[d] the e-mails as a record." *Trial at 320*. However, Defendants fail to explain why this is a reasonable substitute. Indeed, at least one benefit of entering Adams's complaints into the medical log versus relying on the e-mails—a benefit that would have been of critical help in preparing today's decision—would have been the development of a *day-by-day* record of Adams's symptoms as he first complained about them.

*65, 329-30*. This sort of attitude seems to be common: the chief mate, in his later work as a captain, had personally observed vessel owners' reluctance to have crew members seek shoreside medical care, due to the risk (and resulting cost) of having the sailor repatriated. *Mallory Deposition at 31-32*. Accordingly, avoiding costs provides a plausible motivation for the captain to have understated Adams's symptoms in his reports. Weighing all of these factors, then, I do not credit the Captain McAuliffe's testimony regarding Adams's symptoms.

Furthermore, there is the thorny issue of the "Report of Alleged Illness" dated October 30th, 2013. This report features the query, "Has crew member complained of similar or previous alleged injury/illness?" in reference to the condition of "hard to breathe"; the response is marked "no." *Trial at 167-70, 280-81; Defendants' Exhibit K*. The report was signed not only by the captain and the chief mate, but also by Adams himself. *Trial at 167-70, 280-81; Defendants' Exhibit K*. It clearly suggests that Adams did not complain of difficulty breathing until the 30th. Nevertheless, it comes with little context: no similar report exists for Adams's prior complaints, and, as noted above, none of Adams's complaints were entered into the ship's medical log. Thus, it is entirely possible, for example, that this statement was made with the understanding that no *official* complaint—like the report—had been filed for Adams's earlier complaints about his breathing. Alternatively (and more nefariously), the captain could have had Adams sign this form to cover for his prior failure to report the issue. At best, the lack of records makes it unusually difficult to discern the truth of the assertion that Adams had not "complained of similar or previous" illness.[11] Ultimately, then, it is unclear how much probative value to assign to this report. Nevertheless, I find that the balance of the evidence indicates that Adams did, in fact, have breathing issues that were made evident to the captain before the 16th, let alone the 30th.

Accordingly, despite Adams's apparent breathing issues (and his fatigue and ongoing swelling), Captain McAuliffe limited his second report to Future Care on the 16th to Adams's rib

---

[11] Even Adams's signature is left with dubious probative value after considering that this report was made on the day that his medical condition necessitated his evacuation from the ship and caused him to become delirious. *Trial at 123, 156-59, 169*. Indeed, when presented with the document, Adams conceded that it featured his signature but stated that he did not recall the paper. *Id. at 169*. I fully credit that testimony, finding that he was in no condition to examine individual checkbox marks on a form he was required to sign while gravely ill

cage pain.[12] *Plaintiff's Exhibit 2*. Future Care again contacted Dr. Bourgeois, who advised the captain to tell Adams to avoid fatty foods and dairy and to provide him a daily antacid.[13] *Trial at 268; Plaintiff's Exhibit 2*. Apparently, however, Dr. Bourgeois analyzed this latest report without reference to the report filed on October 3rd: not only was he, as a general practice, not always made aware of prior complaints, but in this particular case he admitted that he was "probably not" made aware of the complaint from the 3rd. *Dr. Bourgeois Deposition at 66*. Thus, Dr. Bourgeois's diagnosis was made from an arguably incomplete record, even apart from the omission of certain symptoms.

The captain then showed Adams Dr. Bourgeois's latest diagnosis, following which Adams reduced his intake of dairy and fatty foods and began—or, perhaps, continued—taking Prilosec. *Trial at 61-62, 148-49, 268, 472; Plaintiff's Exhibit 2*. Once again, Future Care reached out a few days later (on the 18th) to check on Adams's status. *Plaintiff's Exhibit 2*. Captain McAuliffe responded that, since following the doctor's advice, Adams was "feeling good" and "has not had a reoccurrence of the pain." *Plaintiff's Exhibit 2*. Once more, conflicting testimony makes it unclear whether Adams's symptoms abated to a significant degree following these communications with Future Care. *Trial at 62-65, 67-68, 69-70, 269; Otumfo Deposition at 23-24; Mallory Deposition at 26-27, 46*. However, the captain offered the only testimony to the contrary (*trial at 282; Plaintiff's Exhibit 2*), and admitted at trial that the chief mate advised him, shortly after the 16th, that Adams required shore-side medical care (*trial at 327*). Accordingly, I find that the evidence shows that Adams continued to exhibit symptoms even after the second report to Future Care.[14]

---

[12] Both Dr. Bourgeois and Defendants' medical expert (Dr. Bergmann) testified that they would have recommended much more extensive testing (e.g., blood work and an EKG) if Adams had exhibited shortness of breath and fatigue in addition to his swelling. *Trial at 462-63; Dr. Bourgeois Deposition at 63*. Consequently, Captain McAuliffe's omissions in this regard were particularly egregious.

[13] As with his previous diagnosis on the 3rd, Dr. Bourgeois noted that a differential diagnosis would have been possible here (specifically, of pneumonia—which would have needed chest X-rays to rule out). *Dr. Bourgeois Deposition at 75*. However, he did not admit to having made such a differential diagnosis at the time.

[14] Testimony from Adams's ultimate treating physician, Dr. Ricardo Duarte, further supports this conclusion. According to Dr. Duarte, given Adams's condition upon admission, he would have been exhibiting no symptoms only "if he was sitting all day doing nothing"—which he clearly was not. *Dr. Duarte Deposition at 41-42*.

Around the time of this second report,[15] Adams began asking his superior officers, including the captain, to see a doctor in person.[16] *Trial at 45-46, 50-51, 57, 66, 179; Otumfo Deposition at 12, 13, 15, 23, 24, 29*. Since there was no doctor on board, this would have meant sending Adams ashore.[17] *Trial at 50-51*. The captain, however, declined Adams's requests—perhaps, as noted above, because a shoreside visit could have imposed costs and delays. *Id. at 45-46, 66, 180; Otumfo Deposition at 13, 16, 22*. This would not have been unprecedented: the captain conceded that he had previously refused another sailor's request for immediate shore-side care. *Trial at 332*. Indeed, the captain seems to have been unusually inclined to believe that Adams did not need shoreside care, suggesting on multiple occasions that he was faking his symptoms because that is "the way to get ashore" and take a break from work. *Id. at 44-45, 285, 323*. As a result—despite Adams's repeated requests and the chief mate's own advice to the captain, *id. at 327*, as well as passing multiple other ports where shoreside care was available, *id. at 284, 286*—Adams did not end up receiving such care for another two weeks.

On October 30th—about a week or so after the ship departed the Port of Sudan—Adams notified Captain McAuliffe that he couldn't breathe and felt sick. *Id. at 166-67, 278; Mallory Deposition at 35*. Apparently, Adams's symptoms had progressed to the point that he suggested he was going to jump from the boat and swim to shore if he were not permitted shore-side care. *Trial at 69, 304*. In response, the captain contacted Future Care again, stating that Adams couldn't breathe, that he had had a stomach bug for the past week, and that his feet had started to swell again. *Id. at 161, 279; Plaintiff's Exhibit 2*. Future Care contacted a different physician advisor, Dr. Akinboboye, who diagnosed "congestive cardiac failure" in short order and ultimately recommended that Adams be treated shore-side on the island of Madeira, a Portuguese territory off the coast of Africa. *Plaintiff's Exhibit 2*. Captain McAuliffe therefore permitted Adams to take shore leave, and Adams was evacuated from the ship. *Trial at 66-70, 75-76*.

---

[15] Adams claims to have begun asking for shoreside treatment starting on the 3rd. However, given that the chief mate told Adams around the 16th that he should see a doctor (*Mallory Deposition at 19, 23-24*)—which would be curious if Adams had *already* been making such requests—it seems more likely that Adams only started making requests for shoreside care after this talk with the chief mate.

[16] As with Adams's complaints about his breathing, these allegations are countered by testimony from the captain that Adams never asked to go ashore for treatment. *Trial at 284-86, 288, 315*. For similar reasons, I decline to credit the captain's testimony on this subject.

[17] Defendants emphasize that Adams never asked to be repatriated (e.g., *trial at 179-80, 286*), but there is a crucial distinction between seeking to go ashore to see a doctor and seeking to be sent back home. Moreover, Adams indicated that he never asked to be repatriated because that "is not the normal procedure." *Id. at 180*.

After disembarking, Adams was admitted to St. Catherine's Clinic, a private clinic on Madeira, to the high dependency unit ("HDU") under the care of Dr. Ricardo Duarte.[18] *Id. at 70, 76, 123; Dr. Duarte Deposition at 26, 31*. At the time he was admitted, Adams was documented as exhibiting shortness of breath, fatigue, atrial fibrillation ("AF"),[19] and swelling in his feet and legs, which (by Adams's own account) had been going on for the past two weeks but had increased in intensity in the prior 48 hours. *Trial at 123; Dr. Duarte Deposition at 27-28, 81-82*. Dr. Duarte also noted that Adams had a history of smoking, as well as preexisting conditions of chronic high blood pressure and diabetes (although Adams exhibited normal blood pressure at the time). *Dr. Duarte Deposition at 27-29, 81*.

After examining Adams and conducting a blood gas test, a chest X-ray, an EKG, and a CT scan, Dr. Duarte and the other physicians at St. Catherine's further concluded that Adams had pneumonia, an elevated respiratory rate, and an elevated heart rate; that his blood was hypoxic (i.e., he had low blood oxygen); and that he exhibited a bilateral pleural effusion.[20] *Id. at 28-29, 71; Trial at 402-03*. Based on these symptoms, Dr. Duarte diagnosed Adams with congestive heart failure ("CHF")[21] complicated with a fast AF, with a possible chest infection.[22] *Dr. Duarte Deposition at 29, 43*. Subsequent blood lab work and a cardiac ultrasound confirmed the diagnosis of heart failure (versus a heart *attack*: heart failure occurs due to strain on the heart, while a heart attack occurs due to insufficient blood supply to the heart). *Id. at 30-31, 62-63*. Specifically, the cardiac ultrasound showed that Adams had a left atrial dilation with mitral valve regurgitation, as well as a compromised systolic function of the left heart. *Id. at 29-31, 62-63*.

---

[18] According to Dr. Duarte, the HDU provides more extensive care than normal wards, but not quite to the level of intensive care units. *Dr. Duarte Deposition at 31, 65*. Adams was admitted to the HDU due to his need for, e.g., 24-hour monitoring and a nurse and doctor "just for [him]." *Id. at 31, 65*.

[19] As defined by Dr. Duarte, atrial fibrillation is an irregular heartbeat caused by improper contraction of the atrium, one of the chambers of the heart. *Dr. Duarte Deposition at 86.*

[20] Defendants' expert defined pleural effusion as "an abnormal finding of fluid on the outside of the lung," i.e., in the body cavity. *Trial at 402-04*. As explained by Dr. Duarte, the pleural effusion was indicative of heart failure, and could have produced the pain in Adams's ribcage. *Dr. Duarte Deposition at 49*.

[21] Dr. Duarte defined CHF to be where the heart "is not working properly as a pump," i.e., is not pumping enough blood to the body. *Dr. Duarte Deposition at 84-85*.

[22] Due to Adams's symptoms, Dr. Rui Oliveira (a fellow physician at St. Catherine's) also deemed Adams "not fit for sea duty." DE 71-8.

As explained by Dr. Duarte, the mitral valve is the valve between the two left chambers of the heart (the left atrium and left ventricle). *Id. at 30, 69*. Mitral valve regurgitation occurs when this valve is not closing correctly, thus enabling the blood to back-flow from the ventricle to the atrium and so increase the blood volume in the heart. *Id. at 70-71*. Left atrial dilation (i.e., dilation of the left atrium), in conjunction with mitral valve regurgitation, can therefore result in a "vicious circle": dilation of the atrium inhibits the atrium from contracting as it should, which results in more back-flow; more blood from the back-flow then causes more dilation, and so forth, ultimately yielding AF. *Id. at 67-68, 70-71*. Thus, the atrial dilation and mitral valve regurgitation can weaken the heart muscle, inhibiting its ability to act as a pump—although in this case the dilation and mitral valve regurgitation were likely more a consequence than a cause of the CHF.[23] *Id. at 45, 67-68, 71*. In a similar vein, the compromised systolic (i.e., contracting) function of the left heart also confirmed the CHF diagnosis. *Id. at 30*. Dr. Duarte noted that compromised systolic function is a particularly urgent concern, as it can cause a patient to go into progressively worse cardiac failure and cardiogenic shock, requiring intensive care and intubation. *Id. at 30*.

Dr. Duarte therefore determined that the CHF dominated the clinical picture and was most likely the first event in the progress of Adams's most recent symptoms. *Id. at 37, 43*. In fact, because "pleural effusion and a bad systolic function do not tend to appear overnight," Dr. Duarte was of the opinion that Adams's heart was likely struggling for days or even weeks prior to admission. *Id. at 41-42*. In Adams's case, the CHF and pneumonia then led to (or substantially amplified) the atrial dilation, compromised systolic function, and fast AF. *Id. at 30, 43-45, 67-69*. Dr. Duarte observed that, for a patient with the conditions that Adams had—high blood pressure, diabetes, coronary artery disease ("CAD"),[24] a history of smoking—CHF arises as a chronic condition that can suddenly manifest at an acute level when the heart gets stressed.[25] *Id. at 37-39,*

---

[23] Dr. Duarte explained that Adams's atrial dilation and mitral valve regurgitation could have developed very slowly over a period of months or years, finally entering AF when the atrium exceeded a certain volume, but indicated that Adams's CHF caused the lion's share of the dilation and regurgitation as part of the "vicious circle." *Dr. Duarte Deposition at 67-69, 71-72*.

[24] While undiagnosed at the time of his treatment, Adams also had coronary artery disease while on the vessel. *Trial at 420, 449*. CAD develops over a period of years or decades; Adams was particularly at risk to develop CAD given, for example, his high blood pressure and history of smoking. *Id. at 414-15; Dr. Duarte Deposition at 39*.

[25] Dr. Duarte thus concluded that Adams's underlying CAD initiated the damage to his heart, but the (CHF-induced) mitral valve regurgitation and the rest of the "vicious circle" propagated and exacerbated the damage to his heart in a sort of snowball effect. *Dr. Duarte Deposition at 92-93*. Defendants' medical expert also acknowledged that Adams's various conditions made him predisposed to develop CHF. *Trial at 449*.

*85, 88*. For example, acute CHF can arise when such a patient exerts themselves in work "outside of the normal range," or when they develop a fast AF. *Id. at 38-39*. Accordingly, Dr. Duarte asserted that if Adams had obtained medical care for his CHF in early October, at the first signs that he had CHF (i.e., his swollen legs and feet), this likely could have prevented the development of his pneumonia and AF. *Id. at 46-48*.

Defendants' medical expert, Dr. Steven Bergmann, disagreed with this conclusion. According to Dr. Bergmann, if Adams had presented with "the beginning of" CHF as of October 3rd, he would not expect Adams to work a full day every day with overtime (as Adams had done).[26] *Trial at 175-78, 287, 427*. Dr. Bergmann argued that Adams's pneumonia or his preexisting CAD and high blood pressure (rather than his CHF) could have caused him to develop AF. *Id. at 406-07, 459, 465-66*. Similarly, Dr. Bergman asserted that Adams's CHF likely did not cause his pleural effusion or pneumonia. *Id. at 404, 408, 453*. Dr. Bergmann therefore concluded that "nothing that occurred onboard between October 3rd and October 30th contributed to Mr. Adams's medical condition." *Id. at 394*. However, there is ample reason to doubt the accuracy of Dr. Bergmann's conclusions.

As an initial matter, Dr. Bergmann justified his positions by claiming that Dr. Bourgeois's initial diagnosis of venous stasis disease was correct, and that Dr. Bourgeois "did exactly what [he] would do" under the circumstances, such as asking whether "there [was] any shortness of breath." *Id. at 395-96, 398*. But Dr. Bourgeois's conduct was, at best, deeply concerning. Dr. Bourgeois was informed that Adams's swelling had started only two days prior, knew that swelling from venous stasis disease "take[s] a fairly long time to develop," and yet diagnosed it anyway—even before Captain McAuliffe answered the questions in his email. *Dr. Bourgeois Deposition at 25, 60; Plaintiff's Exhibit 2*. Dr. Bourgeois failed to inform anyone—much less Adams himself—of his differential diagnosis of CHF, a particularly serious condition. *Dr. Bourgeois Deposition at 18, 20; Plaintiff's Exhibit 2*. He relied on maritime officers with little to no medical training to check Adams's breathing. *Trial at 334-36*. He knew that difficulty breathing could indicate CHF, but waited three days to follow up when Captain McAuliffe failed to respond to his questions about

---

[26] To be sure, it appears that any overtime hours that Adams worked were mandatory, rather than voluntary. *Trial at 36, 305-06, 474*.

Adams's breathing. *Dr. Bourgeois Deposition at 60; Plaintiff's Exhibit 2*. He admitted that "[t]here is no good cure" for the venous stasis disease that he diagnosed and that one "can't reverse the process," and yet accepted in the captain's follow-up email that Adams's "legs were improved" and "the swelling had not returned." *Dr. Bourgeois Deposition at 25-26; Plaintiff's Exhibit 2*. Dr. Bergmann's endorsement of Dr. Bourgeois's conduct in this matter thoroughly undermines Bergmann's credibility as a medical expert.[27]

Second, Dr. Bergmann conceded that the accuracy of his conclusions depended on the accuracy of what was reported to Dr. Bourgeois: if the captain failed to relate Adams's actual conditions, that would prevent a proper diagnosis. *Trial at 424, 430, 440-41, 452*. Thus, for example, Dr. Bergmann affirmed the diagnosis of venous stasis disease in part because someone experiencing heart failure "would say [they're] having shortness of breath." *Id. at 400, 423*. More specifically, if Adams started having shortness of breath a few days after the swelling appeared, the shortness of breath continued over the course of the month, and he began experiencing fatigue that worsened over the course of the month, then that would indicate that Adams had CHF.[28] *Id. at 451, 457-58*. But as established above, Adams demonstrated breathing issues before the 16th, and his other symptoms progressed in much this sort of fashion. Therefore, by Dr. Bergmann's own admission, his conclusions cannot withstand scrutiny as they are built upon a wonky foundation. But even if one were to set aside Adams's actual symptoms (versus what was reported in the emails), Dr. Bergmann conceded that the differential diagnosis of congestive heart failure made sense based on the information presented *in the email sent on October 3rd*.[29] *Id. at 397*. Dr. Bergmann's testimony therefore only *reinforces* the conclusion that Adams was exhibiting CHF before the 16th, likely even as of the 3rd.

---

[27] Unsurprisingly, Dr. Bergmann's testimony elsewhere undermines his avowed support of Dr. Bourgeois's conduct. For example, Dr. Bergmann conceded that he would have wanted answers about Adams's shortness of breath far earlier in order to confirm the differential diagnosis. *Trial at 399*. He also acknowledged that Epsom salt should not resolve the swelling associated with venous stasis disease. *Id. at 441*.

[28] Dr. Bourgeois echoed this conclusion, stating that if Adams's swelling did not abate with the use of Epsom salt, and if Adams started having fatigue and shortness of breath, that may have changed his opinion on the diagnosis of venous stasis disease. *Dr. Bourgeois Deposition at 60-61*.

[29] Curiously, immediately prior to this admission, Dr. Bergmann claimed that there was "[no] suggestion of a coronary problem" in the emails. *Trial at 396*. Such inconsistencies render his medical opinions highly suspect.

This naturally calls into question Dr. Bergmann's other conclusions, e.g., regarding what caused Adams's AF. Dr. Bergmann claimed that Adams's CAD could have caused his AF, yet he also observed that CAD does not develop acutely. *Id. at 420, 459*. Adams's symptoms—including his AF—clearly developed in an acute fashion. Accordingly, the dramatic onset of symptoms (particularly given the absence of any symptoms before October, *Mallory Deposition at 14, Otumfo Deposition at 10*) seems more likely to be the result of the acute onset of CHF that Dr. Duarte discussed. *Trial at 37-38*. Indeed, Dr. Duarte also acknowledged that CAD and high blood pressure can cause AF. *Dr. Duarte Deposition at 83-84, 87*. But Dr. Duarte nevertheless concluded that, in Adams's case, CHF was the primary driver of his symptoms. Therefore, given what Dr. Duarte noted about early diagnoses of CHF—i.e., that early treatment can prevent later hospitalization (a fact confirmed by Dr. Bergmann, *trial at 452*), and that with too much stress CHF can suddenly spike in severity (*Dr. Duarte Deposition at 38, 46-48*)—it strains reason to believe that the delay in treatment for Adams's CHF had *no* effect on his condition. Consequently, I find Dr. Bergmann's conclusions as to the development of Adams's symptoms, and the effect of the delay of treatment for Adams's medical condition, to not be credible.

Returning, then, to Adams's treatment under Dr. Duarte: after a few days of treatment with oxygen and various IV medications, Adams's heart rate changed to a "normal sinus rhythm" and his blood oxygen, respiration rate, and pleural effusion also improved. *Dr. Duarte Deposition at 32-33*. Adams was released on November 4th, when he was found to be "much improved," although not entirely recovered; for example, Adams's heart still had issues with allowing blood back-flow to accumulate, and he still had a pleural effusion. *Id. at 65-66, 91, 124*. Adams was therefore advised to stay in a local hotel for a few days, to enable the doctors to continue to monitor his condition. *Trial at 78-79; Plaintiff's Exhibit 2*. Dr. Duarte ultimately found Adams fit to fly home on November 7th. *Dr. Duarte Deposition at 36*. However, this sort of determination is made on a balancing of the risks: Dr. Duarte was merely looking for enough improvement to justify Adams's flight, not a total recovery. *Id. at 88-89*.

Upon his return to the United States, Adams pursued treatment with his regular physician, Dr. Danny Cheng, who referred him to a cardiologist, Dr. Peter Chang. *Trial at 79-81, 126*. The two physicians provided Adams with new medicine and a new treatment plan. *Id. at 79-81, 126*.

They also conducted several tests that November, including X-rays and blood work, which showed that Adams had normal breath sounds, a normal heart rate, and a normal heart size, plus no swelling, no pleural effusion, and no infection. *Id. at 79-81, 126, 410*. Nevertheless, Adams still required surgery in January (of 2014) to address blockages that had developed in his coronary arteries. *Id. at 82-83, 87, 130; Plaintiff's Exhibits 4, 11*.

Adams's condition improved after these treatments, to the point that—while still presenting with, at the least, high blood pressure, diabetes, and coronary artery disease—he passed a functional capacity exam with the seafarers' health and benefit plan in June of 2014. *Trial at 87, 131-32, 411; Defendants' Exhibit HH*. Shortly after, on July 2, 2014, Dr. Chang found Adams to be at maximum medical improvement ("MMI") and fit for duty, and he released Adams to work without limitations.[30] *Trial at 131-32; Defendants' Exhibit G*. Adams then received a waiver from the U.S. Coast Guard that September for both coronary artery disease and diabetes mellitus. *Trial at 134; Defendants' Exhibit KK*.

Thus, by all accounts, Adams appeared to be cleared to work by multiple parties as of September 2014 (at the latest). Unfortunately, Adams's woes continued. Merely a month later, in October 2014, Adams suffered a mild heart attack with a recurrence of AF, resulting in multiple hospitalizations that month. *Trial at 93-94*. He was once again found to be at MMI and fit for duty by December 22, 2014 and was released for work; however, when he applied for a new position, he failed the requisite physical due to his diabetes. *Id. at 94, 134-36; Defendants' Exhibits OO, PP*. Adams ultimately did accept a job offer on another ship in April 2015, but shortly thereafter refused the job as he "didn't feel good." *Trial at 95-97*. These feelings were apparently prescient, as he was hospitalized the next month for a mild heart attack.[31] *Id. at 97-98*. Due to his medical history, Adams has since declined to seek further employment, as he believes there is no way that he would get medical approval to work. *Id. at 103*. As of the date of trial, Adams was not employed as a seaman. *Id. at 22*.

---

[30] Plaintiff argues that this determination was influenced, at least in part, by Adams informing Dr. Chang of his urgent desire to return to work (out of financial considerations). *Trial at 89-92*. However, there is no testimony from Dr. Chang that he made the determination on this basis; indeed, to have done so would have been unusually irresponsible.

[31] It is worth noting that, as set out above, Dr. Duarte specifically distinguished between heart *failure*—which he treated Adams for—and a heart *attack*.

III. DISCUSSION

## A. Maintenance and Cure

The concept of "maintenance and cure" is an obligation, arising under admiralty law, between vessel owners and the seamen they employ, that is "designed to provide a seaman with food and lodging when he becomes sick or injured in the ship's service." *Vaughan v. Atkinson*, 369 U.S. 527, 531 (1962). Thus, vessel owners are obligated to pay both maintenance, i.e., expenses for "food and lodging," and cure, i.e., expenses for "medical treatment." *Atl. Sounding Co. v. Townsend*, 557 U.S. 404, 413 (2009). This obligation "extends during the period when he is incapacitated to do a seaman's work and continues until he reaches maximum medical recovery," *Atkinson*, 369 U.S. at 531, that is, "until the sick or injured person has been cured, or until the sickness or incapacity has been declared of a permanent character," *Vella v. Ford Motor Co.*, 421 U.S. 1, 3-5 (1975); *see also Messier v. Bouchard Transp.*, 688 F.3d 78, 81 (2d Cir. 2012), *as amended* (Aug. 15, 2012). Thus, a seaman's right to maintenance and cure "may outlast the voyage." *Calmar S. S. Corp. v. Taylor*, 303 U.S. 525, 529 (1938).

Maintenance and cure is an unusually expansive remedy: "although it is limited to the seaman who becomes ill or is injured while in the service of the ship, it is not restricted to those cases where the seaman's employment is the cause of the injury or illness." *Messier*, 688 F.3d at 82. Of particular application here, this obligation "can arise out of a medical condition such as a heart problem [or] a prior illness that recurs during the seaman's employment"; moreover, "a seaman may be entitled to maintenance and cure even for a preexisting medical condition that recurs or becomes aggravated during his service." *Id.*

There is no dispute that the events at issue entitled Adams to maintenance and cure payments. Thus, the only issue is to determine the date upon which Adams reached "maximum medical recovery," i.e., when he was either cured or his incapacity was declared to be permanent. Curiously, Adams was found to be at maximum medical improvement ("MMI") on *two*

occasions: on both July 2 and December 22 of 2014. Such circumstances are not unprecedented: the right to maintenance and cure "may continue to exist, even after . . . the granting of a fitness certificate, until maximum rehabilitation has been attained." *Carlsson v. United States*, 252 F.2d 352, 353 (2d Cir. 1958). However, the burden is then put on the plaintiff "to prove that his unemployment [in the intervening period] was due to his actual physical injury." *Id.* at 354. In this case, Adams suffered a mild heart attack with a recurrence of AF in the time between the two MMI designations. Given that one of the major consequences of Adams's injuries in October 2013 was a fast AF, which can lead to recurrences of AF in the future, it is reasonable to conclude that this event "was due to [the] actual physical injury" that Adams sustained on board the *Liberty Eagle*. However, Adams's later medical issues cannot be so clearly traced to these events: for example, Adams was denied employment in December 2014 due to his longstanding diabetes, while in May 2015 he was hospitalized for a heart attack—a condition that Dr. Duarte explicitly distinguished from the heart *failure* that Adams developed in 2013. Therefore, I find that Adams reached maximum medical recovery from the events at issue on December 22, 2014 and Plaintiff has failed to establish entitlement to maintenance and cure payments past that date.

As this Court established in its order on Defendants' summary judgment motion, Adams may not seek recovery for the whole sum of his food, lodging, and medical expenses, but is limited to seeking recovery only "for the amounts for which he paid or remains obligated." DE 81 at 13. In this case, Adams's total medical expenses, including his prescriptions, amounted to a little over $300,000. *Plaintiff's Exhibit 16*. However, after excluding expenses covered by Liberty or by insurance, Adams *personally* only paid $6,771.85 in medical costs before December 22, 2014. *Trial at 111; Plaintiff's Exhibit 16*. As for food and lodging, Adams was receiving contractually stipulated maintenance payments of $16 per day from Liberty at the time of his early treatment by Dr. Cheng and Dr. Chang. *Trial at 88*. Once these payments ended, Adams had no other source of income; ultimately, Adams sold his home and vehicles in order to pay his bills. *Id. at 89, 115-16*. However, Adams offered no details on when these payments ended, nor the amounts that Liberty might owe for unpaid maintenance—despite this Court

specifically pointing out the absence of such evidence long before trial.[32] DE 81 at 13. Thus, Adams has made no showing regarding his entitlement to maintenance payments.

Adams further contends that he is due punitive damages and attorneys' fees for Defendants' failure to pay maintenance and cure on a timely basis. It is true that punitive damages may be awarded "for the willful or wanton failure to comply with the duty to pay maintenance and cure." *Townsend*, 557 U.S. at 422. Recovery for such failure "may also include 'necessary expenses'" such as attorney's fees. *Atkinson*, 369 U.S. at 530. However, Plaintiff provides no evidence that Defendants' failure to pay any maintenance and cure payments was "willful or wanton." Moreover, in total, Defendants ultimately failed to pay only a small fraction of Adams's total medical expenses. Accordingly, I find that Adams is not entitled to punitive damages for any failure on Defendants' part to promptly pay their maintenance and cure obligations.

In sum, I find that Adams is entitled to maintenance and cure payments only for the amount that he personally paid for his medical expenses up to December 22, 2014: that is, $6,771.85.

## B. Unseaworthiness

"Unseaworthiness is a claim under general maritime law based on the vessel owner's duty to ensure that the vessel is reasonably fit to be at sea." *Lewis v. Lewis & Clark Marine, Inc.*, 531 U.S. 438, 441 (2001). "Under the doctrine of unseaworthiness, a vessel owner has the duty to provide its seamen 'with a ship and appurtenances that are reasonably fit for their intended purposes.'" *Haney v. Miller's Launch, Inc.*, 773 F. Supp. 2d 280, 288 (E.D.N.Y. 2010) (quoting *Sojak v. Hudson Waterways Corp.*, 590 F.2d 53, 54 (2d Cir. 1978)). The "general rule" for seaworthiness "is that the vessel must be staunch, strong, well equipped for the intended voyage and manned by a competent and skillful master of sound judgment and discretion." *Id.* (quoting *Tug Ocean Prince, Inc. v. United States*, 584 F.2d 1151, 1155 (2d Cir. 1978)). Liability for

---

[32] Indeed, Plaintiff himself claims that Adams continued to receive maintenance payments into "the latter part of 2014." DE 88 at 11.

seaworthiness "does not depend on negligence or the owner's notice of the condition, and has therefore been characterized as 'liability without fault.'" *Soliman v. Maersk Line Ltd*, 235 F. Supp. 3d 410, 418 (E.D.N.Y. 2017) (internal citations omitted); *see also Usner v. Luckenbach Overseas Corp*., 400 U.S. 494, 498 (1971) ("[U]nseaworthiness is a condition, and how that condition came into being—whether by negligence or otherwise—is quite irrelevant to the owner's liability for personal injuries resulting from it."). Nevertheless, the condition of seaworthiness "does not require perfection or an accident-free vessel." *Haney*, 773 F. Supp. 2d at 288. A plaintiff may establish causation by proving that the "unseaworthiness played a substantial part in bringing about or actually causing the injury, and . . . the injury was either a direct result or reasonably probable consequence of unseaworthiness." *Id; see also Soliman*, 235 F. Supp. 3d at 418-19.

Plaintiff contends that the *Liberty Eagle* was unseaworthy because Liberty failed "to implement adequate training and policies, such as a procedure to follow" when crew members (like Adams) "became ill aboard the vessel," yielding "at best confusion and at worst willful nondisclosure among officers and Future Care about reporting procedures." DE 88 at 15. It is true that vessel owners have been held liable where they have "provided no training, no assessment of the risks, and provided no instruction on how [a maritime] task might be performed safely." *Harrington v. Atl. Sounding Co.,* 916 F. Supp. 2d 313, 325 (E.D.N.Y. 2013), *affirmed sub nom. Marasa v. Atl. Sounding Co.*, 557 F. App'x 14 (2d Cir. 2014). More specifically, "[a] crew is incompetent, and thus the ship unseaworthy, when the ship's owner fails to provide adequate training for the task to be performed." *Soliman*, 235 F. Supp. 3d at 418.

However, where liability is imposed for failure to provide adequate training, the training at issue typically relates to the operation of the vessel. *See, e.g.*, *Harrington*, 916 F. Supp.2d at 325 (addressing training on "pulling line anchors through an open stern"); *In re Moran Towing Corp.,* 984 F. Supp. 2d 150, 175-76 (S.D.N.Y. 2013) (addressing training on how to "safely perform a swing maneuver, operate the capstan, or handle towlines"); *Cerro Sales Corp. v. Atl. Marine Enterprises, Inc.*, 403 F. Supp. 562, 567 (S.D.N.Y. 1975) (addressing training on how to "handle a fire emergency" on board); *In re Bridge Const. Servs. of Fla., Inc.*, 39 F. Supp. 3d 373, 392 (S.D.N.Y. 2014) (addressing training "regarding safety procedures," specifically how to

handle ice accumulation on the vessel).[33] If one understands the "intended purposes" of the crew, *see Haney*, 773 F. Supp. 2d at 288, to be the safe and effective operation of the vessel, then it seems reasonable to limit the types of training for which liability may be imposed to those concerning such operation. Based on this understanding, it is not clear that the alleged failure to train the officers of the *Liberty Eagle* in procedures for reporting medical concerns would qualify the vessel as being "unseaworthy." However, the Court need not decide this question at this time, as Plaintiff fails to show a failure on Liberty's part to provide adequate training in this regard.[34]

Liberty had contracted with Future Care to provide medical support services, including telemedicine services, on board the *Liberty Eagle*. The extent of these services, as demonstrated by the events here, appears to have been relatively shallow. But Plaintiff's argument is limited to the sufficiency of the officers' training in what procedure to follow should a crew member fall ill. The availability of Future Care's services substantially lessens the necessary sophistication of such training: i.e., so long as the ship's officers were aware of the existence and extent of Future Care's services, as well as how to obtain them, then the officers' training would seem to be adequate.

The record clearly shows that the ship's officers were, in fact, aware of the existence of Future Care's services as well as how to obtain them. The clearest example of this, of course, is Captain McAuliffe's prompt communication with Future Care shortly after first observing the swelling in Adams's legs. But there is abundant evidence showing that the officers on the *Liberty Eagle* were generally well-acquainted with Future Care's services. For example, Liberty required its employees to review a document entitled "Liberty Maritime Corporation Medical Advice and Assistance," which featured a section entitled "Captain's Procedures" in boldface that listed Future Care's emergency 24-hour call-line and contact details for non-emergencies. *Trial at 374;*

---

[33] As suggested by the court in *Soliman*, lack of training may be construed as a form of incompetence of the crew, another basis for unseaworthiness. The analysis for "competence of a ship's crew" further illustrates the navigation-related focus of the inquiry, as it "depends upon several factors, including (1) whether the captain, pilot, and navigator are licensed; (2) whether they have satisfactory safety records; (3) whether they are familiar with the vessel and the waters on which it travels; and (4) whether they are adequately trained." *In re Complaint of Sea Wolf Marine Towing & Transp., Inc.*, No. 03CV5578(KMW)(THK), 2007 WL 3340931, at *2 (S.D.N.Y. Nov. 6, 2007) (internal quotations omitted).

[34] One can imagine that the notion of seaworthiness could cover insufficient or negligent provision of medical care, though the need to consider such a construction is abated by Plaintiff's demonstration of actionable negligence.

*Mallory Deposition at 43; Defendants' Exhibit O.* The document explicitly advises to "post these instructions where they can be located in an emergency" and specifies what information should be provided to Future Care in any request for medical assistance. *Trial at 374-75; Defendants' Exhibit O.* Moreover, "[i]t was part of [Liberty's] policy" for the crew "to review all company instructions," including this guide. *Mallory Deposition at 43.*

These instructions even addressed the procedures to follow where Future Care's services would be insufficient to meet the severity of the medical emergency at hand. Specifically, they discussed circumstances where "the crew member requires shoreside medical treatment," for which Future Care would "coordinate all arrangements with treating facilities." *Trial at 374; Defendants' Exhibit O.* The officers on the *Liberty Eagle* were clearly familiar with this possibility: for example, Captain McAuliffe noted that he contacted Future Care on the 3rd and 16th in part to see whether Adams "required shore-side medical care." *Trial at 317.* Therefore, there is no indication that the training that Liberty provided regarding the "procedure to follow" for medical emergencies was inadequate. The instructions that Liberty issued, and the directive to review them, are sufficient to meet Liberty's burden—to the extent that one exists before a vessel may be deemed "seaworthy"—to provide adequate training on the procedure for handling medical emergencies.

In sum, Plaintiff has failed to show that the *Liberty Eagle* was unseaworthy at the time of his injuries and therefore is not entitled to damages on this ground.

## C. Negligence of Liberty Maritime

"The Jones Act provides a federal remedy for seamen injured as a result of negligence." *Haney*, 773 F. Supp. 2d at 286. While claims for unseaworthiness and negligence under the Jones Act are often brought together, the remedies for each "have different origins and may on occasion call for application of slightly different principles and procedures.'" *Townsend*, 557 U.S. at 423. In distinguishing between unseaworthiness and negligence, the Supreme Court held

in *Usner* (addressing an injury caused to a longshoreman by a fellow longshoreman's negligent operation of a power winch):

> "What caused the petitioner's injuries in the present case, however, was not the condition of the ship, her appurtenances, her cargo, or her crew, but the isolated, personal negligent act of the petitioner's fellow longshoreman. To hold that this individual act of negligence rendered the ship unseaworthy would be to subvert the fundamental distinction between unseaworthiness and negligence that we have so painstakingly and repeatedly emphasized in our decisions."

*Usner*, 400 U.S. at 500. The distinction that the Supreme Court draws here indicates that a *condition* of a crew member rendering him unfit for his ordinary duties may render the vessel unseaworthy, but an *isolated act of negligence* committed by an otherwise competent crew member would not. *See Hogge v. SS Yorkmar*, 434 F. Supp. 715, 736 (D. Md. 1977). Thus, a vessel owner may be found liable for negligence even where the vessel at issue was found to be seaworthy.

For negligence actions brought under the Jones Act, "[t]he plaintiff must prove by a preponderance of the evidence that: (1) he was employed by the defendant as a seaman and was acting within the scope of his employment at the time of the accident; (2) defendant's actions were negligent; and (3) defendant's negligence caused his injuries." *Haney*, 773 F. Supp. 2d at 286. Proof of causation under the Jones Act requires only a showing that "employer negligence played any part, *even the slightest*, in producing the injury . . . for which damages are sought." *Diebold v. Moore McCormack Bulk Transp. Lines, Inc.*, 805 F.2d 55, 57 (2d Cir. 1986) (citing *Rogers v. Missouri Pac. R. Co.*, 352 U.S. 500, 506 (1957) (emphasis in original)). There is no dispute that Adams was employed by Liberty as a seaman and was acting within the scope of this employment at the time of his injuries. Accordingly, the inquiry is limited to (a) whether Liberty was negligent, and (b) whether such negligence caused Adams's injuries.

Shipowners have "the duty to provide proper medical treatment for seamen falling ill or suffering injury in the service of the ship. This is a duty imposed without fault; it is no mere

formal obligation . . . and a violation of it is actionable under the Jones Act." *Fitzgerald v. A. L. Burbank & Co.*, 451 F.2d 670, 679 (2d Cir. 1971). "In the circumstances of this case," as in *Fitzgerald*, "there are two ways in which the shipowner may have been negligent in exercising this duty. One is in improperly providing for a seaman's care, including the negligent selection of a doctor; the other is in the negligence of the doctor himself." *Id.* at 679. What care is required in a specific instance "depends largely on the facts of the case–the seriousness of the injury or illness and the availability of aid" such that "the trier must take into account such factors as whether the ship was at sea or in port and, if in port, what medical facilities were available, and, if such facilities were obviously extremely limited or inadequate, what means were reasonably obtainable to transfer the seaman to the nearest adequate medical facility." *Id.* at 680.

*1. Negligence in the Selection of Future Care*

Plaintiff has not shown that Liberty was negligent in the selection of Adams's medical care. Plaintiff has provided no evidence, for example, that Liberty failed to conduct due diligence before selecting Future Care as its medical services provider, or that Future Care's physicians are generally disreputable or unqualified. Rather, Plaintiff focuses instead on the nature of Liberty's contract with Future Care, arguing that Future Care's services were directed not to providing adequate care but to "minimizing cost." *Trial at 482*. As noted above, the parties dispute the nature of these services, and indeed, the answer is not entirely straightforward. Liberty claims that it had retained Future Care to provide multiple services: telemedicine advice, claims management, and medical bill auditing. *Id. at 346-47*. However, Liberty's contract with Future Care states in the first paragraph that its intended purpose is for "medical cost containment services." *Id. at 352; Plaintiff's Exhibit 27*. The contract goes on to state, more explicitly, that Future Care "is not a provider of medical services per se, and it is not responsible for the actual medical treatment, including the success or failure thereof, of any or all Eligible Person(s) designated and covered under this Agreement," making Future Care's obligations "restricted solely to provision of the Medical Cost Containment Services." *Plaintiff's Exhibit 27*.

The "services" specifically provided for in the contract further illustrate these limitations. They are primarily addressed to (often cost-saving) services ancillary to ongoing medical care

provided by third parties, such as "auditing of [medical] bills," "medical Case Management," "the provision . . . of access to preferred provider organization ('PPO') network rates," and "the scheduling of second-opinion medical exams and/or medical record reviews." *Id*. Indeed, the exception here proves the rule: the lone provision clearly providing for advice from a Future Care physician, the "Physician Advisory Program," explicitly only contemplates the provision of such care "until [the] patient is examined by a land base [sic] physician." *Id*. It is evident from these provisions that the medical services that Future Care offered were never intended to be comprehensive.

Nevertheless, there is little to indicate, as Plaintiff claims, that this extended to deliberately "going for the least expensive treatment possible" as a rule. *Trial at 230-31*. Rather, the "cost containment" services that Future Care provided appear to have been addressed to "work[ing] with the crewman, his family, treatment providers," and other relevant parties "to manage the quality, timeliness, and cost of medical treatment." *Jacobson Deposition at 45*. Thus, Future Care is "not involved in payment" and cannot "deem a treatment or procedure to be unnecessary"—the "cost containment" services are provided post-treatment "to eliminate billing for what [they] might consider to be an unnecessary procedure." *Id. at 48-49*. Consequently, there is nothing to indicate that Liberty was negligent in selecting Future Care as its medical services provider.

## 2. Negligence of Dr. Bourgeois

However, Plaintiff *has* established that Dr. Bourgeois was negligent in his treatment—shockingly so—for which Liberty may be held liable: "the negligence of a doctor may be imputed to the shipowner-employer," including where "medical services were provided, under contract, for the shipowner as part of its operational activities." *Fitzgerald*, 451 F.2d at 680. In this case, Future Care (and, by extension, Dr. Bourgeois) clearly provided medical services "under contract" for Liberty "as part of [Liberty's] operational activities," i.e., as a means for Liberty to discharge its duty to provide medical treatment for its crew. *Id.*; *see also De Zon v. Am. President Lines*, 318 U.S. 660, 668 (1943) (holding shipowner liable for any negligence on the part of the doctor where "it was the ship's duty that he was discharging in treating the

[injury]" and "he was performing the service because the ship employed him to do so."). The proper standard for malpractice in Jones Act cases "is simply whether the physician exercised the degree of care and skill of the average qualified practitioner of the art and science of medicine." *Fitzgerald*, 451 F. 2d at 680. In order to establish such malpractice, expert testimony is required to establish "the proper standard of medical care against which to measure the defendant's actions." *Dinnerstein v. United States*, 486 F.2d 34, 36 (2d Cir. 1973). However, "the trier of fact may even base a finding of negligence on the expert testimony of the defendant-doctor." *Id.*

The facts set out above clearly establish that Dr. Bourgeois pronounced the wrong diagnosis on both occasions in which he provided medical advice. However, the fact that he made a wrong diagnosis "does not prove that it was a negligent one." *De Zon*, 318 U.S. at 671. If the diagnosis of venous stasis disease "seemed to be the obvious diagnosis" from the information provided to him, despite that information being "incomplete and not unlikely to mislead," then his diagnosis was not negligent. *Id.* Indeed, it has been established that Dr. Bourgeois *was* operating on incomplete information, as certain of Adams's symptoms were not relayed to him.[35] Nevertheless, "the question for expert guidance–but still for ultimate determination by the trier of fact–was whether it was reasonably foreseeable on the basis of" the information presented to Dr. Bourgeois that Adams should have been tested more extensively for CHF. *Dinnerstein*, 486 F.2d at 37.

First, based on the information available to Dr. Bourgeois, Adams's CHF should have been reasonably foreseeable, and should have been treated with consequent concern. Captain McAuliffe's email explicitly informed Dr. Bourgeois that Adams had diabetes, which according to Dr. Bergmann's and Dr. Duarte's testimony made Adams predisposed to developed CHF. Dr. Bourgeois actually formulated a differential diagnosis of CHF, and knew that if Adams had breathing issues then this would support a CHF diagnosis. In fact, if Adams had exhibited breathing issues, both Dr. Bourgeois and Dr. Bergmann would have recommended much more extensive testing than would have been possible on board the *Liberty Eagle*. Yet Dr. Bourgeois

---

[35] However, the fact that Dr. Bourgeois developed a differential diagnosis of CHF *at the time*, one that was later borne out, means that venous stasis disease (even if a possible diagnosis) was never "the *obvious* diagnosis." *De Zon*, 318 U.S. at 671 (emphasis added).

trusted untrained maritime officers to examine Adams's breathing, without any further guidance than to "check his breath sounds for any wheezing or rough crackles." Dr. Bergmann testified that one needs training in how to use a stethoscope for such purposes, but Dr. Bourgeois failed to ask whether the crew had access to a stethoscope, let alone the appropriate training for it. Second, Dr. Bourgeois's diagnosis of venous stasis disease was inappropriate, particularly as it overshadowed the correct, though unspoken, differential diagnosis. Dr. Bourgeois conceded that swelling caused by venous stasis disease takes a long time to develop, but Captain McAuliffe's email clearly states that Adams's swelling began only two days prior. Similarly, Dr. Bergmann observed that Epsom salt should not resolve the swelling associated with venous stasis disease, yet Dr. Bourgeois not only prescribed Epsom salt for this diagnosis but readily accepted that its use reduced Adams's swelling. Despite these issues with the diagnosis, Dr. Bourgeois diagnosed venous stasis disease even before getting a response from the captain about Adams's breathing— and waited three days to follow up on the breathing issues, a delay that even Dr. Bergmann indicated was too long.[36] All of these actions suggest a lack of ordinary care on the part of Dr. Bourgeois.

The facts at issue are broadly similar to those at issue in *De Centeno v. Gulf Fleet Crews, Inc.*, 798 F.2d 138 (5th Cir. 1986), and a comparison here may be instructive. In *De Centeno*, the seaman plaintiff reported to the master of his vessel that he was ill; the vessel's agent arranged for him to see a local physician, a Dr. Turner. *Id.* at 139. Dr. Turner treated the seaman for influenza and returned him to the ship; however, the seaman's condition nevertheless deteriorated in the following days, and upon arriving home four days later he immediately went to a local physician, a Dr. Chavarria. *Id.* Based on the seaman's symptoms, Dr. Chavarria ordered a blood test and, from its results, diagnosed diabetes and found that "any physician confronted with a patient displaying these symptoms should have suspected diabetes and ordered a blood test to rule it out." *Id.* The Fifth Circuit found that, in light of these facts, the jury "was

---

[36] Defendants argue that Adams did not himself report breathing issues until after Dr. Bourgeois's follow-up email on October 6th, so following up sooner would have made no difference. DE 108 at 2. Even if this were true, however, Dr. Bourgeois's wholesale failure to inform the captain or Adams of his differential diagnosis meant that they were unaware of the gravity of such a symptom, to which they may have given insufficient attention as a result. Moreover, the fact that Dr. Bourgeois both asked if Adams had difficulty breathing *and* advised to check his breath sounds suggests that breathing issues may have been revealed by appropriate testing even if Adams had yet to report any issues.

entitled to find that [the seaman's] diabetic symptoms were present when he visited Dr. Turner," and "was also entitled to find that these symptoms should have alerted Dr. Turner to order a blood test which would have revealed the diabetes." *Id.* at 140. The court therefore affirmed the jury's finding that the vessel owner was negligent in its duty to provide adequate medical treatment. *Id.*

In much the same way here, Dr. Bergmann acknowledged that Dr. Bourgeois should have suspected CHF,[37] and Dr. Bergmann conceded (although not in such explicit terms) that Adams's breathing should have been checked by someone with the appropriate training. Dr. Bourgeois failed to arrange for this: having Adams's breathing checked by non-professionals was insufficient to meet "the degree of care and skill of the average qualified practitioner," as Dr. Bergmann's testimony established. *Fitzgerald*, 451 F. 2d at 680. If Dr. Bourgeois had required someone with medical training to check Adams' breathing, or provided instructions beyond "check his breath sounds for any wheezing or rough crackles," this may well have revealed issues that would have led Dr. Bourgeois (by his own admission) to recommend more extensive testing, including blood work and an EKG. Given that these same tests ultimately revealed Adams's CHF at St. Catherine's, and his CHF appears to have developed by this point in October, it seems likely that these tests "would have revealed" Adams's CHF at a far earlier date. *De Centeno*, 798 F. 2d at 140. Accordingly, like the jury in *De Centeno*, I find that Liberty was negligent in its duty to provide adequate medical treatment.

Liberty's failure in this regard is critical: as Dr. Duarte stated, had Adams obtained medical care for his CHF in early October, he likely could have avoided both hospitalization and the development of his AF. *See Sentilles v. Inter-Caribbean Shipping Corp.*, 361 U.S. 107, 109–10 (1959) (The power of the finder of fact "to draw the inference that the aggravation of [plaintiff's] condition, evident so shortly after the accident, was in fact caused by that accident, was not impaired by the failure of any medical witness to testify that it was in fact the cause. Neither can it be impaired by the lack of medical unanimity as to the respective likelihood of the potential causes of the aggravation, or by the fact that other potential causes of the aggravation existed and were not conclusively negated by the proofs."); *see also Fitzgerald*, 451 F.2d at 681

---

[37] And indeed, Dr. Bourgeois *did* suspect CHF, as demonstrated by his formulation of the differential diagnosis.

("The jury decides whether or not there was proximate cause, and they may do so . . . in the absence of direct medical testimony on the point."). Having established Liberty's negligence in providing adequate treatment, i.e., in providing for relevant testing in early October, Dr. Duarte's testimony in this regard is more than sufficient to show that Liberty's negligence "played any part, *even the slightest*, in producing [Adams's] injury." *Diebold*, 805 F.2d at 57. Nevertheless, this injury is limited in duration in the manner described above in the discussion on maintenance and cure: that is, Liberty's negligence exacerbated the consequences of Adams's CHF, but did not cause his underlying conditions of, e.g., diabetes or CAD. Accordingly, Liberty is only liable for the injuries suffered by Adams until he reached the point of maximum medical improvement from the events on board the *Liberty Eagle*, i.e., until December 22, 2014.

*3. Statute of Limitations*

Defendants nevertheless argue that any claims based on Dr. Bourgeois's malpractice are barred by 46 U.S.C. § 30510 and, concomitantly, the State of Louisiana's statute of limitations on malpractice claims. Section 30510 reads as follows:

> In a civil action by any person in which the owner or operator of a vessel or employer of a crewmember is claimed to have vicarious liability for medical malpractice with regard to a crewmember occurring at a shoreside facility, and to the extent the damages resulted from the conduct of any shoreside doctor, hospital, medical facility, or other health care provider, the owner, operator, or employer is entitled to rely on any statutory limitations of liability applicable to the doctor, hospital, medical facility, or other health care provider in the State of the United States in which the shoreside medical care was provided.

46 U.S.C. § 30510. In turn, Louisiana's statute of limitations for malpractice claims establishes that:

> "No action for damages for injury or death against any physician . . . shall be brought unless filed within one year from the date of the alleged act, omission, or neglect, or

within one year from the date of discovery of the alleged act, omission, or neglect;
however, even as to claims filed within one year from the date of such discovery, in all
events such claims shall be filed at the latest within a period of three years from the date
of the alleged act, omission, or neglect."

La. Rev. Stat. 9:5628(A)*; see also Carter v. Bisso Marine Co.*, 238 F. Supp. 2d 778, 792 (E.D.
La. 2002). Defendants contend that Plaintiff's complaint "was filed on October 14, 2016," and
therefore any claims based on Dr. Bourgeois's negligence before October 14, 2013 are barred by
the Louisiana statute of limitations. However, the record clearly reflects that Adams filed his
complaint on September 26, 2016. Assuming the tolling provision of the Louisiana statute does
not apply, however, Adams's claims do not fall into the resulting one-year limitations period.
Nevertheless, I find that Adams's claims do not fall under the Louisiana statute of limitations and
so are not barred by the applicable limitations period.

Defendants' argument turns on their allegation that "at all relevant times Dr. Bourgeois
resided, was licensed, and ran his office out of the State of Louisiana." DE 108 at 3. However,
§ 30510 critically applies only to treatment "occurring at a *shoreside facility*"; the provision
reiterates this point by stating that a vessel owner may rely on the statute of limitations in the
State "in which the *shoreside* medical care was provided." 46 U.S.C. § 30510 (emphasis added).
But the treatment at issue did not occur shoreside: Dr. Bourgeois's treatment occurred
exclusively when Adams was on board the *Liberty Eagle*. The language of the statute is therefore
of questionable application to telemedicine services, and indeed, this seems to be an issue of first
impression in the courts. When crafting this particular provision in 1996, Congress may not have
contemplated the prospect of telemedicine, and so did not actively exclude telemedicine from the
relevant limitations periods. *See* H.R. CONF. REP. 104-854, at 1 (1996), *reprinted in* 1996
U.S.C.C.A.N. 4292, 4292. However, the testimony of Liberty's vice president of operations,
William Campbell, that telemedicine "was already in existence" and used by Liberty in 2002
suggests that Congress may indeed have chosen to make such an exclusion. *Trial at 347.*
However, without clear evidence either way, I am bound by the text of the statute, which clearly
establishes its restriction to *shoreside* treatment. Accordingly, I find that the Louisiana statute of

limitations does not apply to Adams's claims. Instead, his claims are governed by—and fall within—the three-year limitations period for maritime tort claims. *See* 46 U.S.C. § 30106.

## D. Negligence of Captain McAuliffe

As an initial matter, Captain McAuliffe cannot be held liable for negligence under the Jones Act. "[O]nly a seaman's employer can be held liable under the Jones Act." *Fitzgerald*, 451 F.2d at 674. Furthermore, "under the Jones Act only one person, firm, or corporation can be sued as employer." *Cosmopolitan Shipping Co. v. McAllister*, 337 U.S. 783, 791 (1949). "In the normal case, the shipowner is the employer," and there is nothing to suggest otherwise here. *Fitzgerald*, 451 F.2d at 674 n.2. Nevertheless, the ship's officers may also be found to be negligent in their care for a crew member. Typically, where an officer on a particular vessel is claimed to be negligent, it is for the purpose of claiming liability against the vessel's owner.[38] *See, e.g.*, *Poindexter v. Groves,* 197 F.2d 915, 917 (2d Cir. 1952); *Stuart v. Alcoa S.S. Co.*, 143 F.2d 178, 179 (2d Cir. 1944); *De Centeno*, 798 F.2d at 140. For the following reasons, I find that Captain McAuliffe was negligent in his duty to provide appropriate medical care for Adams.

"[N]egligence is the failure to exercise reasonable care . . . under the circumstances." *Carmody v. ProNav Ship Mgmt., Inc.*, 224 F.R.D. 111, 123 (S.D.N.Y. 2004). "Because of the guardian-ward relationship between the master and his seamen, the master is required to exercise due care in providing for his men who become ill." *Fitzgerald*, 451 F.2d at 680 (2d Cir. 1971). Indeed, both the chief mate and Liberty's vice president confirmed that it is the duty of a captain to ensure that "any person onboard that required medical care would get the medical care that they need." *Trial at 362; Mallory Deposition at 22*. As with the similar duty on Liberty's part, what care is required in a specific instance "depends largely on the facts of the case–the seriousness of the injury or illness and the availability of aid," such that "the trier must take into account such factors as whether the ship was at sea or in port and, if in port, what medical facilities were available, and, if such facilities were obviously extremely limited or inadequate,

---

[38] Indeed, a ship owner may also be found negligent under the Jones Act where "one of its officers, employees, or agents was negligent." *Carmody v. ProNav Ship Mgmt., Inc.*, 224 F.R.D. 111, 122 (S.D.N.Y. 2004). As a result, Liberty is liable for Adams's injuries due to Captain McAuliffe's negligence as well as that of Dr. Bourgeois.

what means were reasonably obtainable to transfer the seaman to the nearest adequate medical facility." *Fitzgerald*, 451 F.2d at 680.

Captain McAuliffe clearly failed to exercise reasonable care in providing for Adams's care. Once more, the circumstances in *De Centeno* are illustrative: there, the Fifth Circuit affirmed a finding that "the ship's officers were negligent in failing to seek additional medical treatment" despite "the seaman's condition deteriorat[ing] after his visit" with a company-arranged doctor. *De Centeno*, 798 F. 2d at 139-40. Here, Captain McAuliffe similarly failed to seek shoreside care for Adams despite his condition enduring and, in some respects, deteriorating after both his first and second contact with Dr. Bourgeois. This error is particularly glaring given that the *Liberty Eagle* was in a port for much of this time—a place where, ostensibly, "medical facilities were available."[39] *Fitzgerald*, 451 F.2d at 680. Although the captain stated that he would have arranged for shore-side care for Adams if Future Care had advised it was necessary, *trial at 315, 338*, responsibility cannot be shifted to Future Care where, as established, they were operating on incomplete information. However, much more egregious was the captain's total failure to address Adams's symptoms, particularly his shortness of breath and continued swelling, in his communications with Future Care on October 16th and 18th. It is nearly impossible to conceive of a situation in which such omissions would be reasonable, particularly as to such worrying symptoms, even in ordinary circumstances. But Captain McAuliffe was *explicitly* asked about Adams's breathing in his previous communications with Future Care, which should have put him on notice to alert them if any breathing issues did arise. His failure to do so is therefore exceptionally delinquent.

Much like Dr. Bourgeois's negligence, Captain McAuliffe's failure to provide appropriate care for Adams also clearly helped to cause his ultimate injuries. Both Dr. Bourgeois and Dr. Bergmann testified that, if informed about Adams's breathing issues, they would have recommended additional testing; such testing likely would have revealed Adams's CHF. And if Adams had obtained medical care for his CHF in early October, he likely could have avoided

---

[39] Even if (as the captain implied) the medical services in the Port of Sudan were sub-par, treatment for CHF early on, when the "clinical picture is not severe," is relatively straightforward—manageable by a general practitioner and requiring only prescription medication without a hospital stay. *Dr. Duarte Deposition at 46*.

both hospitalization and the development of his AF. Although the captain's omissions occurred in the days following Dr. Bourgeois's misdiagnosis, it nevertheless appears that Adams could have avoided the bulk of his injuries if the captain had acted with the appropriate care. Accordingly, I find that the captain is also liable for the injuries suffered by Adams until he reached the point of Maximum Medical Improvement from the events on board the *Liberty Eagle*, i.e., until December 22, 2014.

## E. Negligence Damages

*1. Lost Wages*

Prior to the events detailed above, Adams normally worked about eight months per year as a seaman, with an income of $89,743 in 2011 and $86,194 in 2012. *Trial at 106-09*. Adams earned $63,427 in 2013, although the events at issue kept him from working the last two months of 2013 as he had planned. *Id. at 108-09*. Adams had no earnings in 2014, and while Adams received income from his pension and social security benefits in 2015, since 2014 he has not had sufficient income to file tax returns. *Id. at 109-10*. Based on these figures, plaintiff's economic expert, Dr. Gary Crakes, calculated that Adams would have earned $81,429 in 2013 absent his hospitalization. *Id. at 200-01*. Dr. Crakes further calculated that, assuming Adams was only able to work at minimum wage after his hospitalization, his net (after tax) discounted economic loss from November 2013 until his retirement would be $527,831.[40] *Id. at 202, 220*.

However, Dr. Crakes's estimates are based on certain assumptions that may not—or, in some cases, clearly do not—apply. For example, the estimates assume that Adams's alternative to work as a sailor (which, it seems, is now impossible for him to obtain, *id. at 22, 103*) was work at minimum wage. However, plaintiff presents no evidence that this is, in fact, the case.[41] Similarly,

---

[40] Based on Adams's discounted expected earnings as a sailor and the value of his employee benefits for this period (i.e., until Adams reached the age of 67), as well as a minimum wage of $7.25/hour. *Trial at 201-02*. Adams had originally planned to work until he is 67 (i.e., until 2021) in order to reach maximum Social Security benefits. *Id. at 115*.

[41] In fact, Dr. Crakes stated that he did not review any documents revealing Adams's functional capacity to work (e.g., for a job paying above minimum wage). Nevertheless, given his specialized work experience and limited education, Adams does not appear to be qualified for other forms of skilled labor. *Trial at 20-22*.

the estimates fail to account for Social Security or pension benefits, but Adams is concededly receiving at least the latter. *Id. at 113, 221*. Finally, the estimates assume that Adams would have been generally capable of working until age 67. *Id. at 213*. Thus, if Adams's work life expectancy were shortened—e.g., if he were barred from work as a sailor for reasons unrelated to the incident at issue—his economic loss would only be measured only for that shortened period. *Id. at 218*. Similarly, if Adams's impairment were removed—e.g., if, at some point, he were to be found fit for duty with no limitations—then the economic loss would similarly only be measured until that time. *Id. at 219*. However, Dr. Crakes helpfully noted that, given the low interest rates and relatively short period of time involved in his calculations, setting $63,000 per year as a rough loss approximation would be a fair estimate. *Id. at 223*.

Based on the established facts, I find that Adams's relevant impairment only lasted until the date of his second determination of MMI on December 22, 2014. After that point, any loss of work cannot clearly be attributed to the incidents at issue. Accordingly, factoring in Dr. Crakes's approximation of Adams's annual pay, applied to the 418 days between Adams's hospitalization and the date of his second determination of MMI, I find that Adams is entitled to lost wages of $72,150.

## 2. Pain and Suffering

"To determine whether a particular award [of damages for pain and suffering] is excessive, courts have often found it useful to look at other cases involving similar injuries, keeping in mind that any given judgment is based on its own facts and circumstances." *Carmody*, 224 F.R.D. at 128; *see also Scala v. Moore McCormack Lines, Inc.*, 985 F.2d 680, 684 (2d Cir. 1993). A few cases provide helpful guidance in this regard. *Carmody* deemed a jury award of $1 million "not excessive" given that the plaintiff's pain and suffering "was unquestionably severe." *Carmody*, 224 F.R.D. at 130. Due to an untreated onset of plaintiff's diabetes while on board the defendant's vessel, the plaintiff "had to stay in bed most of the time, was barely able to go to his office," at one point "lost consciousness," and "eventually became less lucid and . . . his speech became slurred." *Id.* at 123-24. Once he was hospitalized, the plaintiff's suffering continued, as he developed "'vivid' hallucinations and dreams, which 'still bother [him] today,'" and engaged

in physical therapy that was "exhausting, grueling, and painful." *Id.* at 129. Ultimately, the plaintiff's injuries left him with multiple permanent disabilities that barred him from engaging in certain activities. *See id.* In *Scala*, the Second Circuit found an award of $750,000 to be appropriate where the plaintiff injured his knees, requiring two arthroscopic surgeries and leaving the plaintiff bedridden and (later) in a wheelchair for a number of months. *Scala*, 985 F.2d at 682-84. Even after being treated, the plaintiff "experience[d] occasional pain and suffering in his knee" and "chronic back pain" as a result of his injury. *Id.* at 682. Finally, in *Bachir v. Transoceanic Cable Ship Co.*, the court found an award of $1,250,000 not to be excessive where the plaintiff tripped and fell, resulting in multiple injuries to his spine, right hip, and foot, as well as post-traumatic stress disorder ("PTSD"). *See Bachir*, No. 98 CIV. 4625 (JFK), 2002 WL 413918, at *1, *11 (S.D.N.Y. Mar. 15, 2002).

In contrast to the cases above, even if Adams was exhibiting concerning symptoms through the month of October, he was able to work his regular hours (including overtime) and some of his symptoms (e.g., his swelling) were at least somewhat attenuated with the use of Epsom salt and Prilosec. Furthermore, while Adams had to undergo further surgical procedures and hospitalization even after his initial treatment at St. Catherine's, there is no evidence clearly linking Adams's pain and suffering beyond December of 2014 to the events on the *Liberty Eagle* (as opposed to, for example, his chronic diabetes and CAD). Furthermore, even during the course of 2014 Adams pursued the necessary certifications for work from the seafarer's health and benefit plan and the Coast Guard, suggesting that he personally felt to be in sufficiently good health to attempt to go back to work. Thus, in the aggregate, the pain and suffering experienced by Plaintiff, while not insubstantial, appears far less serious than that examined in *Scala, Carmody* and *Bachir*.

Accordingly, upon careful consideration, I find that an award of $216,450, a sum equal to three times the recoverable lost wages, is appropriate pain and suffering award in light of the facts established above. Said sum represents adequate, though not excessive. compensation for the harm sustained by Plaintiff.

*3. Punitive Damages*

"[T]he failure of a vessel owner to provide proper medical care for seamen has provided the impetus for damages awards that appear to contain at least some punitive element." *Townsend*, 557 U.S. at 414. However, punitive damages may only be awarded where "the defendant was guilty of gross negligence, or actual malice or criminal indifference which is the equivalent of reckless and wanton misconduct." *In re Marine Sulphur Queen*, 460 F.2d 89, 105 (2d Cir. 1972); *see also Moran Towing Corp.*, 984 F. Supp. 2d at 187 ("Punitive damages may only be awarded where a defendant's conduct is intentional, wanton and reckless, or constitutes gross negligence."). An award of punitive damages "is discretionary with the trial court." *Marine Sulphur Queen*, 460 F.2d at 105.

To meet that standard in this case, Plaintiff "would have to establish either that the defendant was aware of [plaintiff's condition] and deliberately failed to [address] it, or that the [condition] was so dire, and/or continued for such a lengthy period of time that failure to [address] the condition was grossly negligent." *McCrann v. U.S. Lines, Inc.*, No. 81 CIV. 0486 (MEL), 1985 WL 2881, at *5 (S.D.N.Y. Oct. 2, 1985). I find that Plaintiff has made such a showing with regard to Captain McAuliffe's conduct. Specifically, the evidence in the record does not seem to be sufficient "to establish that the [captain] was guilty of actual malice or was criminally indifferent." *Id.* As suggested above, it is entirely likely that Captain McAuliffe's omissions in his emails to Future Care can be explained by a predisposition to overlook certain of Adams's symptoms; there is certainly nothing in the record to suggest that the captain was motivated by malice. Nevertheless, the captain's negligence here was egregious. It should be patently obvious to anyone charged with another's care to report *all* of their serious symptoms when seeking medical care. The fact that the captain was *specifically* asked about Adams's breathing, and still failed to report his later breathing issues, makes this failure inexcusable. In a similar vein (although not a factor in Adams's injuries), Captain McAuliffe's failure to record Adams's complaints into the ship's medical log, along with the completion of a medical report falsely stating that Adams had not previously reported breathing difficulties, bears the hallmarks of an attempted cover-up, further justifying the imposition of a punitive award.

"It is incontestable that traditional punitive damages are not limited to the amount of attorney's fees." *Hicks v. Tug PATRIOT*, 783 F.3d 939, 944 (2d Cir. 2015). Nevertheless, in light of Adams's ultimate recovery from the events on board the *Liberty Eagle* (notwithstanding his ongoing medical issues relating to his previously underlying conditions), I find it appropriate to limit the award of punitive damages to Plaintiff's reasonable attorney's fees. Plaintiff's counsel has not filed its bills and contemporaneous time records with the present motion, and substantial time and resources have already been expended in connection with this litigation. To expedite this matter without the need for additional litigation,[42] the Court will impose the award of attorney's fees as a reasonable percentage of Plaintiff's total recovery. *Cf., e.g.*, *Gwozdzinnsky v. Sandler Assocs.*, 159 F.3d 1346 (2d Cir. 1998) (finding an "award of twenty-five per cent" of the total recovery in a class action suit to be "reasonable in this case and in keeping with common practice"); *United States v. Tobee*, No. 10-CV-0731 (JS), 2010 WL 1853767, at *1 (E.D.N.Y. 2010) (setting award of attorney's fees as 20 percent of the total recovery); *Gay v. Tri-Wire Eng'g Sols., Inc.*, No. 12-CV-2231 KAM JO, 2014 WL 28640, at *11 (E.D.N.Y. 2014) (collecting cases where awards ranged between 30 and 40 percent of the total recovery). As such, an award of $98,475, amounting to one-third of the pain and suffering, lost wages and maintenance & cure awarded to Plaintiff, shall be imposed as punitive damages against Captain McAuliffe, representing payment of Plaintiff's attorney's fees.[43]

However, the issue then arises as to whether Liberty may be held liable for punitive damages based on Captain McAuliffe's conduct. This Court previously addressed this issue in detail in its ruling on Defendants' summary judgment motion, observing that there presently exists a circuit split over the standard to apply to this question, one observed (but not resolved) by the Supreme Court. DE 81 at 15-18; *see also Exxon Shipping Co. v. Baker*, 554 U.S. 471 (2008). The First Circuit in *CEH, Inc. v. F/V Seafarer* listed three commonly understood approaches: first, where punitive damages "are treated indistinguishably from compensatory

---

[42] "A request for attorney's fees should not result in a second major litigation." *Hensley v. Eckerhart*, 461 U.S. 424, 437 (1983); *Buckhannon Bd. & Care Home, Inc. v. W. Va. Dep't of Health & Human Res.*, 532 U.S. 598, 609 (2001). Furthermore, "the fee applicant bears the burden of . . . documenting the appropriate hours expended and hourly rates." *Hensley*, 461 U.S. at 437.

[43] In light of this unusual award, Plaintiff's counsel should recognize that no other amounts for attorney's fees should be deducted as an offset from Plaintiff's recovery for attorney's fees without further application to the court. Litigation costs, of course, are a different matter.

damages, and traditional *respondeat* liability attaches"; second, where employers are liable for punitive damages only for "those acts participated in, authorized or ratified"; and finally, a variation of this second approach which also extends liability "regardless of authorization or ratification, to acts committed by a managerial agent within the scope of employment." *CEH, Inc.*, 70 F.3d 694, 703 (1st Cir. 1995). As this Court observed in its summary judgment ruling, which still appears to be the case today, there is not "any Second Circuit guidance as to which approach constitutes the law in this Circuit." DE 81 at 18.

Defendants point to *Stepski v. M/V NORASIA ALYA*, in which the Southern District elected "to follow the majority of circuits" and require a showing "either (1) that the owner ratified or authorized the agent's actions, (2) that an agent acting in a managerial capacity within the scope of his employment acted egregiously and that the principal shares blame for the wrongdoing, or (3) that the owner himself acted recklessly in employing the agent." *Stepski*, No. 7:06-CV-01694, 2010 WL 6501649, at *10 (S.D.N.Y. Jan. 14, 2010). I find this approach to strike a reasonable balance between the strict complicity rule requiring authorization or ratification, and the arguably overbroad *respondeat* liability. Plaintiff presents no evidence that Liberty ratified or authorized Captain McAuliffe's omissions in his emails to Future Care, or his failure to enter Adams's complaints into the ship's medical log. Similarly, this Court held in its order on Defendants' summary judgment motion that "there is no basis for a claim of negligent hiring against Liberty" with regard to Captain McAuliffe. DE 81 at 15-16. Accordingly, this leaves only the second basis for liability set out in *Stepski*.

The Southern District in *Stepski* declined to find that the offending captain had the requisite "managerial capacity" for imputing liability to the vessel owner, pointing to the First Circuit's opinion in *CEH, Inc.* which allowed punitive damages where the captain had "total authority' to hire and fire crew, to determine location and targets of trips, to sell catch, and to set forth and implement policies for vessel's crew and operations." *Stepski*, 2010 WL 6501649, at *11. As a result, the captain in *CEH, Inc.* "had 'complete managerial discretion over the means and methods'" of pursuing the business of the vessel. *CEH, Inc.*, 70 F.3d at 705. However, any captain having "total authority" over the operations of a vessel would, in effect, have all of her actions ratified or authorized by the vessel's owner. Requiring this degree of authority would

thus make the "managerial capacity" basis of imputing liability redundant. Accordingly, I find that the requisite capacity may be met by something less than total authority, which in most cases the captain of a vessel (in contrast to other kinds of agents) will exhibit simply by the nature of her office.[44] There is nothing to indicate that that is not the case here; as Captain McAuliffe testified, he "ha[d] a lot of different responsibilities" as captain, including "to provide for the medical care for crew members." *Trial at 362*.

Thus, the next issue is to consider whether Liberty "shares blame for the wrongdoing." The record demonstrates that Captain McAuliffe had a surprising amount of discretion, or at least a lack of oversight by Liberty, in questions relating to Adams's medical care. For example, he declined to even inform Adams that he could communicate with a Future Care physician directly, despite asking another seaman to do so in the past. *Trial at 255-56, 301*. Similarly, he had full authority over whether to permit Adams to obtain shoreside care, *id. at 315, 338*, yet declined to do so. Thus, in contrast to the captain in *Stepski*, Captain McAuliffe was not "under orders" from Liberty to comply with Future Care's advice, but was merely advised that it would be "foolish" not to seek their help. *Stepski*, 2010 WL 6501649, at *11; *Trial at 375; Defendants' Exhibit O*. Furthermore, decisions like these were subject to few internal checks: for example, there is no evidence that, after the chief mate advised Captain McAuliffe that Adams required shore-side care—advice that went unheeded for weeks afterward—he then went over the captain's head with his concerns. It is not clear that doing so would have even been possible. After all, no other onboard personnel (such as the ship's medical officer) were privy to the captain's communications with Future Care. *See Plaintiff's Exhibit 2*. Thus, notwithstanding Liberty's instructions "to provide accurate information passed by all parties," *trial at 377*, there were no onboard checks on any failure by the captain to do so. As a result, while Captain McAuliffe did copy Liberty's corporate office on his emails, there was no way that anyone could be sure that he was conveying correct information, either to Future Care or to Adams. Given this distressing lack of oversight, I find that Liberty "shares some of the blame" for the Captain's gross negligence, *Stepski*, 2010 WL 6501649, at *10, in light of its nearly "complete delegation of authority" regarding Adams's medical care, *CEH, Inc.*, 70 F.3d at 705. Accordingly, liability for the punitive damages award is also imputed to Liberty.

---

[44] *See* DE 81 at 17 n.5 (collecting cases).

*4. Prejudgment Interest*

"Although the allowance of prejudgment interest in admiralty is said to be a matter committed to the trial court's discretion, it should be granted in the absence of exceptional circumstances." *Moran Towing Corp*., 984 F. Supp. 2d at 188 (collecting cases). Defendants have not established any such circumstances, and I find an award of prejudgment interest appropriate.

Prejudgment interest in this case is calculated using the rate set by New York state law, as Plaintiff could have proceeded in New York state court, where he would have been awarded the state statutory prejudgment interest rate on any damages award. *See id.* Here, prejudgment interest is appropriate as to all claims. *See id.* (citing *Williams v. Reading & Bates Drilling Co.*, 750 F.2d 487, 491 (5th Cir.1985) ("We hold, therefore, that when a Jones Act claim is brought under the court's admiralty jurisdiction, and hence the case is tried to the court and not the jury, the allowance of prejudgment interest is within the discretion of the trial court even if there is not a finding of unseaworthiness.")). Under New York law, the statutory prejudgment interest rate is set at nine percent per year. N.Y. C.P.L.R. § 5004. Plaintiff is therefore entitled to prejudgment interest at an annual rate of 9% measured from the date of his hospitalization, October 30, 2013. The dollar amount "is calculated by multiplying the total amount of past damages by nine percent, then dividing that period by 365 (representing the days of a year) and multiplying that figure by the number of days" between the date of hospitalization and the date of judgment. *Moran Towing Corp.*, 984 F. Supp. 2d at 188.

IV. CONCLUSION

For the reasons set forth above, it is HEREBY ORDERED THAT:

1. Defendant Liberty Maritime is liable for maintenance and cure in the amount of $6,771.85.

2. Defendant Liberty Maritime is not liable for any damages as a result of the alleged unseaworthiness of the *Liberty Eagle*.

3. Defendant Liberty Maritime is vicariously liable for the negligence of Dr. Brian Bourgeois and Captain John McAuliffe, while Defendant John McAuliffe is individually liable for his own negligence. Both Defendants are therefore jointly and severally liable for the resulting damages of $72,150 in lost wages and $216,450 in pain and suffering, for a total of $288,600.

4. Defendant John McAuliffe is liable for punitive damages as a result of his gross negligence in the form of attorney's fees. This liability is also imputed to Defendant Liberty Maritime for its own role in enabling this negligence. Both Defendants are therefore jointly and severally liable for attorney's fees in the amount of one-third of the total recovery, i.e., $98,475.

5. Plaintiff is entitled to prejudgment interest at the New York statutory award of 9%, measured from the date of his hospitalization on October 30, 2013.

**SO ORDERED**.

Dated:  Central Islip, New York
         July 31, 2020

          /s/ Gary R. Brown
         GARY R. BROWN
         United States District Judge